IN THE SUPREME COURT OF TEXAS






IN THE SUPREME COURT OF TEXAS
 
════════════
No. 04-1104
════════════
 
Richard Fiess and Stephanie 
Fiess, Appellants,
 
v.
 
State Farm Lloyds, 
Appellee
 
════════════════════════════════════════════════════
On Certified Question from the United 
States
Court of Appeals for the Fifth 
Circuit
════════════════════════════════════════════════════
 
 
Argued March 30, 
2005
 
Justice Brister delivered the opinion 
of the Court, in which Chief Justice 
Jefferson, Justice Hecht, Justice 
Wainwright, Justice Green, 
Justice Johnson, and Justice Willett joined.
 
Justice Medina filed a dissenting 
opinion, in which Justice O’Neill 
joined.
 
 
The question 
in this case is not whether insurers should provide mold coverage in Texas, a 
public policy question beyond our jurisdiction as a court. The question instead 
is whether the language in an insurance policy provides such coverage C no more and no less.
The rules for 
construing insurance policies have been around for a long time, long before this 
dispute arose. Those rules require us to construe a policy according to what it 
says, not what regulators or individual insurers thought it said. Ambiguities in 
the plain language must be settled in favor of consumers, but they must appear 
in the policy itself C 
we cannot create ambiguities from previous policies, an agency’s interpretation, 
or a “mold crisis.” 
The policy 
here provides that it does not cover “loss caused by mold.” While other parts of 
the policy sometimes make it difficult to decipher, we cannot hold that mold 
damage is covered when the policy expressly says it is not. Accordingly, we 
answer the Fifth Circuit’s certified question “No.”
I. “We do not cover loss caused by mold”
This case 
comes to us on a certified question[1] from the United States 
Court of Appeals for the Fifth Circuit, which asks us:
 
            
Does the ensuing loss provision contained in Section I-Exclusions, part 1(f) of 
the Homeowners Form B (HO-B) insurance policy as prescribed by the Texas 
Department of Insurance effective July 8, 1992 (Revised January 1, 1996), when 
read in conjunction with the remainder of the policy, provide coverage for mold 
contamination caused by water damage that is otherwise covered by the policy?[2]
 
 
The policy 
provision in question provides as follows:
 
We do not 
cover loss caused by:
(1)        
wear and tear, deterioration or loss caused by any quality in property that 
causes it to damage or destroy itself. 
(2) 
       rust, rot, mold or other fungi. 
(3) 
       dampness of atmosphere, extremes of 
temperature. 
(4) 
       contamination. 
(5)        
rats, mice, termites, moths or other insects. 
We do cover 
ensuing loss caused by collapse of the building or any part of the building, 
water damage, or breakage of glass which is part of the building if the loss 
would otherwise be covered under this policy.[3] 
 
 
The rules for 
construing this provision are well settled. If a policy provision has only one 
reasonable interpretation, it is unambiguous and we must construe it as a matter 
of law.[4] If an exclusion has more 
than one reasonable interpretation, we must construe it in favor of the insured 
as long as that construction is not unreasonable.[5] A policy provision is not 
ambiguous merely because different parties or different courts have interpreted 
it differently.[6] 
As with any 
other contract, the parties’ intent is governed by what they said, not by what 
they intended to say but did not.[7] Moreover, in cases like 
this involving a standard form policy mandated by a state regulatory agency, we 
have held for more than 100 years that the actual intent of the parties is not 
what counts (as they did not write it), but the ordinary, everyday meaning of 
the words to the general public.[8]
In this case, 
it is hard to find any ambiguity in the ordinary meaning of “We do not cover 
loss caused by mold.” While the ensuing-loss clause that follows may be 
difficult to parse (a matter discussed below), few ordinary people would imagine 
that it changes the meaning of the first sentence to read “We do too 
cover loss caused by mold.”
The dissent 
finds this policy ambiguous, primarily by construing the preceding HO-B policy, 
on the basis that no change was intended when that form was dropped in 1990. 
Evidence of prior policies is extrinsic evidence, and thus inadmissible unless 
this policy is ambiguous.[9] Ambiguity must be evident 
from the policy itself; it cannot be created by introducing parol evidence of 
intent.[10] And while we have looked 
at a prior policy in deciding between reasonable constructions of a current 
one,[11] we have never done so in 
lieu of construing the current one at all. Given the complexities found in most 
insurance policies, it is surely wiser to stick with our long-standing legal 
rule that insurance policies must be construed one policy at a time.
Nor can we 
agree with the dissent that this policy is ambiguous because the Texas 
Department of Insurance advances an interpretation that, while not convincing, 
is a reasonable alternative to our own. It is true that courts give some 
deference to an agency regulation containing a reasonable interpretation of an 
ambiguous statute.[12] But there are several 
qualifiers in that statement. First, it applies to formal opinions adopted after 
formal proceedings, not isolated comments during a hearing or opinions in 
documents like the Department’s amicus brief here.[13] Second, the language at 
issue must be ambiguous; an agency’s opinion cannot change plain language.[14] Third, the agency’s 
construction must be reasonable;[15] alternative 
unreasonable constructions do not make a policy ambiguous.[16] An agency’s opinion can 
help construe an existing ambiguity, but it cannot create one; that the 
Department agrees with the Fiess’s construction does not make this policy 
ambiguous.[17]
Moreover, 
neglecting what this policy says in favor of what the Department says it 
intended would raise a host of other problems. First, construing a statewide 
policy according to what a single regulator, insurer, or insured thought about 
it would bind many others without hearing what they might have intended. Second, 
even if no change was intended in 1990, that does not tell us what anyone 
intended before 1990, an issue we have never addressed. And finally, 
deriving intent from extrinsic evidence raises a fact question for jurors, not 
judges;[18] while ambiguous exclusions 
must be construed in favor of the insured as long as that construction is not 
unreasonable,[19] ambiguous intentions are 
not governed by the same legal rule.
We must of 
course consider an insurance policy in its entirety. But in doing so, we cannot 
overlook the obvious — that the policy provision here begins by stating 
unambiguously, “We do not cover loss caused by mold.” 
II. “We do cover ensuing loss caused by water damage . . 
.”
The Fiess’s 
argue that we must disregard how this policy provision starts (“We do not cover 
loss caused by mold”) because of how it ends (“We do cover ensuing loss caused 
by water damage”). We disagree; it has again long been the rule that we must 
read all parts of a policy together, giving meaning to every sentence, clause, 
and word to avoid rendering any portion inoperative.[20] 
In Lambros 
v. Standard Fire Insurance Co.,[21] homeowners alleged 
underground water cracked the slab of their home. Like the policy here, their 
policy excluded losses due to cracked foundations, but also stated that this 
exclusion “shall not apply to ensuing loss caused by . . . water damage.” 
Justice Cadena writing for the Fourth Court of Civil Appeals found that the only 
reasonable construction of this clause was that it applied when an excluded risk 
was followed by an intervening occurrence that in turn caused an ensuing 
loss:
 
To “ensue” 
means “to follow as a consequence or in chronological succession; to result, as 
an ensuing conclusion or effect.” An “ensuing loss,” then, is a loss which 
follows as a consequence of some preceding event or circumstance . . . . If we 
give to the language of the exception its ordinary meaning, we must conclude 
that an ensuing loss caused by water damage is a loss caused by water damage 
where the water damage itself is the result of a preceding cause. What is the 
preceding cause which gives to the exception the effect of taking the ensuing 
loss out of the reach of exception k [the foundation exception]? Again, the 
plain language of the exception compels the conclusion that the water damage 
must be a consequence, i.e., follow from or be the result of the types of damage 
enumerated in exception k. “Ensuing loss caused by water damage” refers to water 
damage which is the result, rather than the cause, of “settling, 
cracking, . . . of foundations . . .”[22]
 
 
This Court 
refused the application for writ of error, thus giving the Lambros 
opinion the same force and effect as one of our own.[23] 
The part of 
the ensuing‑loss clause at issue in Lambros is indistinguishable from the 
part at issue here. The Department of Insurance asserts that the Lambros 
policy covered fewer water risks and the homeowners’ claim did not involve 
mold. But the relevant ensuing‑loss language has changed in no material respect; 
that Lambros involved a different house, different homeowners, and a 
different insurer does not make it distinguishable. If Lambros is still 
the law, then this clause too applies only to losses caused by an intervening 
cause (like water damage) that in turn follow from an exclusion listed in 
paragraph 1(f).
The Fiesses 
and the Department make several arguments for construing ensuing‑loss clauses 
differently, but all would require reversing Lambros. That of course is 
not out of the question; our opinions are not like the law of the Medes and the 
Persians — unalterable once written.[24] But we are bound to 
consider the principles of stare decisis before taking such a step.
Stare decisis 
has its greatest force in cases construing statutes, partly because our errors 
may be corrected by statutory amendments.[25] Although Lambros 
did not construe a statute, it was the next thing to it — a mandatory policy 
form promulgated by a state agency that private parties could not alter. If our 
policy interpretation in Lambros was wrong, it is strange that insurance 
regulators did nothing to change the policy for a quarter century. Accordingly, 
we decline the invitation to overrule it.
III. “. . . caused by water damage . . .”
Nor can we 
disregard how this policy provision starts (“We do not cover loss caused by 
mold”) because of how it ends (“We do cover ensuing loss caused by water 
damage”), as the latter is not as broad as the Fiesses suggest. By its own 
terms, paragraph 1(f) covers only ensuing losses from water damage, not 
water alone.
The parties 
disagree whether mold stemming from the small roof and window leaks at issue 
here would constitute “water damage.”[26] While we have never 
construed “water damage” in the Texas homeowners ensuing-loss clause, the 
legendary Henry Friendly[27] did (sitting with the 
Fifth Circuit by designation), and concluded that inadequate ventilation that 
led to condensation that eventually caused a floor to rot away did not fall 
within the Texas ensuing-loss clause because the rot was caused by water, not 
“water damage”:
 
We do not 
think that a single phenomenon that is clearly an excluded risk under the policy 
was meant to become compensable because in a philosophical sense it can also be 
classified as water damage; it would not be easy to find a case of rot or 
dampness of atmosphere not equally subject to that label and the exclusions 
would become practically meaningless. In our case the rot may have ensued from 
water but not from water damage, and the damage ensuing from the rot was not the 
damage from the direct intrusion of water conveyed by the phrase “water 
damage.”[28]
 
Surely Judge 
Friendly was correct. Mold does not grow without water; if every leak and drip 
is “water damage,” then it is hard to imagine any mold, rust, or rot excluded by 
this policy, and the mold exclusion would be practically meaningless. 
The 15 risks 
excluded by paragraph 1(f) — rust, rot, mold, humidity, wear and tear, hot and 
cold weather, rats, termites, and so on — all damage a home incrementally; when 
they cause major damage, generally the home was not destroyed in a day. These 15 
risks are also very common; construing the HO-B policy to cover them all would 
convert it from an insurance policy into a maintenance agreement. 
Instead, the 
ensuing-loss clause provides coverage only if these relatively common and 
usually minor risks lead to a relatively uncommon and perhaps major loss: 
building collapse, glass breakage, or water damage. In construing the last term, 
we are governed by the traditional canon of construction noscitur a sociis 
— “that a word is known by the company it keeps.”[29] Accordingly, “water 
damage” like its neighbors “building collapse” and “glass breakage” must refer 
to something more substantial than every tiny water leak or seep. Applying this 
traditional rule of construction, ordinary people would read paragraph 1(f) to 
provide coverage for the kinds of uncommon and catastrophic losses for which 
homeowners obtain insurance, not for the common maintenance items for which they 
do not. 
We need not 
decide today the precise scope of “water damage” in the ensuing-loss clause, an 
issue not framed by the certified question. The issue we do decide is that a 
policy exclusion for “mold” cannot be disregarded by simply deeming all mold to 
be “water damage.”
III. “. . . if the loss would otherwise be covered under this 
policy”
All members 
of the Court affirm Lambros and refuse to construe the ensuing-loss 
clause outside its context. But the dissent would hold that the ensuing-loss 
clause cancels the mold exclusion of which it is a part, because its last phrase 
(“if the loss would otherwise be covered under this policy”) requires us to 
disregard paragraphs 1(f), 1(g), and 1(h) of the policy. Clearly, removing the 
22 exclusions in those paragraphs would create mold coverage, but it would also 
create a different policy. To qualify as an ensuing loss, mold must “otherwise 
be covered under this policy.”
Here, the 
first sentence of 1(f) excludes mold, and the second sentence extends coverage 
to ensuing losses caused by water damage. If neither sentence said anything 
more, the two would conflict whenever water damage (covered) caused mold 
(excluded). But 1(f) resolves this potential conflict by limiting the second 
clause — the ensuing-loss clause — whenever it conflicts with anything else in 
the policy. By placing this proviso where it is, the only reasonable 
construction is that the second sentence (covering ensuing losses) must yield to 
the first (excluding mold), not the other way around.
This does 
not, as the dissent suggests, delete “otherwise” from paragraph 1(f). 
“Otherwise” when used as an adverb means “in a different way or manner; in 
different circumstances”;[30] it does not mean we should 
disregard the immediately preceding sentence. Assume, for example, that the 
flight schedule of a certain airline stated:
 
We do not 
fly from Dallas to Denver.
We do fly 
from Dallas to all cities otherwise listed in this flight schedule.
 
 
No reasonable 
reader would think “otherwise” means we should disregard the preceding sentence 
and assume the airline really does fly from Dallas to Denver.
The dissent 
would rewrite the ensuing-loss clause here to provide coverage “if the loss 
would otherwise be covered under this policy not counting the exclusions in 
paragraph 1(f), 1(g), and (h).” But those exclusions are part of the 
policy; a policy without exclusions for rust, rot, mold, wear and tear, and 
termites is simply a different policy. This would be policy “construction” in 
the architectural rather than the legal sense.
Moreover, the 
upshot of the dissent’s construction would be that the more risks excluded 
in a policy containing an ensuing-loss clause, the broader coverage 
would become. Paragraphs 1(f), 1(g), and 1(h) of the HO-B policy contain roughly 
22 exclusions, and each has an ensuing-loss clause listing 3 intervening risks 
(building collapse, water damage, and glass breakage). According to the dissent, 
if any one of the 22 exclusions combines with any one of the 3 intervening risks 
to cause any of the 22 excluded losses, the loss is no longer excluded. This 
would mean there are only about 1,452 possible ways to turn exclusions into 
coverage.[31] Thus, the more exclusions 
that are added, the broader coverage gets. This cannot possibly be a reasonable 
construction.
Finally, a 
“yes” answer to the certified question today would give ensuing-loss clauses in 
Texas a different meaning from what they have in most other American 
jurisdictions. These clauses are common in all-risk policies, and while rarely 
identical they share more similarities than differences.[32] Accordingly, we should 
strive for uniformity in construing them.[33] But the Fiess’s argument 
that an ensuing-loss clause can make an excluded loss reappear as a covered loss 
has been rejected by courts in Alabama,[34] Arizona,[35] California,[36] Florida,[37] Illinois,[38] Massachusetts,[39] Minnesota,[40] New York,[41] North Carolina,[42] New Hampshire,[43] Ohio,[44] Pennsylvania,[45] Vermont,[46] Washington,[47] and Wisconsin.[48] There would have to be 
something very peculiar about the Texas ensuing-loss clause for its results to 
be so very different from similar clauses used everywhere else.
V. Conclusion
Courts adhere 
to prior precedents for reasons of efficiency, fairness, and legitimacy.[49] For more than a century 
this Court has held that in construing insurance policies “where the language is 
plain and unambiguous, courts must enforce the contract as made by the parties, 
and cannot make a new contract for them, nor change that which they have made 
under the guise of construction.”[50] If the political branches 
of Texas government decide that mold should be covered in Texas insurance 
policies, they have tools at their disposal to do so; Texas courts must stick to 
what those policies say, and cannot adopt a different rule when a “crisis” 
arises.[51] 
Accordingly, 
for the reasons and to the extent stated in this opinion, we answer the 
certified question “No.”
 
________________________________
Scott 
Brister
Justice
 
OPINION DELIVERED: August 
31, 2006




[1] See Tex. 
Const. art. V, § 3‑c; Tex. R. 
App. P. 58.1. 

[2] 392 F.3d 802, 811‑812 (5th Cir. 2004).

[3] We do not address personal property coverage under 
paragraph 9 (accidental discharge, leakage or overflow of water) of the HO-B 
policy because the Fifth Circuit Court of Appeals concluded that the Fiesses 
failed to appeal that issue. Id. at 805 n.5. 

[4] Texas Farm Bureau Mut. Ins. Co. v. 
Sturrock, 146 S.W.3d 123, 126 (Tex. 2004); E. Texas Fire Ins. Co. v. 
Kempner, 27 S.W. 122, 122 (Tex. 1894).

[5] Nat’l Union Fire Ins. Co. v. Hudson Energy Co., 
Inc., 811 S.W.2d 552, 555 (Tex. 1991); Glover v. Nat’l Ins. 
Underwriters, 545 S.W.2d 762, 763 (Tex. 1977); Continental Cas. Co. v. 
Warren, 254 S.W.2d 755, 761 (Tex. 1953).

[6] Kelley‑Coppedge, Inc. v. Highlands Ins. Co., 980 
S.W.2d 462, 465 (Tex. 1998); Grain Dealers Mut. Ins. Co. v. McKee, 943 
S.W.2d 455, 459 (Tex. 1997).

[7] Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 
738, 741 (Tex. 1998) (“Our primary goal, therefore, is to give effect to the 
written expression of the parties’ intent.”); Nat’l Union Fire Ins. Co. v. 
CBI Indus., 907 S.W.2d 517, 520 (Tex. 1995); Univ. C.I.T. Credit Corp. v. 
Daniel, 243 S.W.2d 154, 157 (Tex. 1951). 

[8] See Progressive County Mut. Ins. Co. v. Sink, 
107 S.W.3d 547, 551 (Tex. 2003) (“[W]here the policy forms are mandated 
by a state regulatory agency . . . we look to determine the ordinary, everyday 
meaning of the words to the general public.”); U.S. Ins. Co. of Waco v. 
Boyer, 269 S.W.2d 340, 341 (Tex. 1954) (“While undoubtedly in the early days 
of the insurance business the actual intent of the immediate parties to the 
contract was material, now with the insurance business regulated and the policy 
forms prescribed by a State Insurance Commission, the court in construing a 
policy determines the everyday meaning of the words to the general public—the 
meaning of the words ‘in common parlance’— ‘the usual and popular understanding 
of the term.’“); Mutual Life Ins. Co. v. Simpson, 31 S.W. 501, 502 (Tex. 
1895) (“[C]ontracts of insurance, like other contracts, are to be construed 
according to the sense and meaning of the terms which the parties have used, and 
if they are clear and unambiguous, their terms are to be taken and understood in 
their plain, ordinary and popular sense.”).

[9] Sharp v. State Farm Fire and Cas. Ins. Co., 115 
F.3d 1258, 1262 (5th Cir. 1997); Balandran, 972 S.W.2d at 741; 
CBI, 907 S.W.2d at 520-21. 

[10] See CBI, 907 S.W.2d at 521.

[11] See Balandran, 972 S.W.2d at 
741‑42.

[12] See Chevron U.S.A. Inc. v. Natural Resources Defense 
Council, Inc., 467 U.S. 837, 842-44 (1984); City of Corpus Christi v. 
Public Utility Com'n of Texas, 51 S.W.3d 231, 261 (Tex. 2001). 


[13] See Christensen v. Harris County, 529 U.S. 576, 
587 (2000) (refusing to defer to agency policy statements, agency manuals, and 
enforcement guidelines lacking the force of law); see also Reno v. Koray, 
515 U.S. 50, 61 (1995); EEOC v. Arabian American Oil Co., 499 U.S. 244, 
256‑258 (1991); Martin v. Occupational Safety and Health Review Comm'n, 
499 U.S. 144, 157 (1991).

[14] See Pretzer v. Motor Vehicle Bd., 138 S.W.3d 
908, 915 (Tex. 2004); Continental Cas. Co. v. Downs, 81 S.W.3d 803, 807 
(Tex. 2002); City of Corpus Christi, 51 S.W.3d at 261; Stanford v. 
Butler, 181 S.W.2d 269, 273 (1944).

[15] Downs, 81 S.W.3d at 807 (Tex. 2002); Tarrant 
Appraisal Dist. v. Moore, 845 S.W.2d 820, 823 (Tex.1993); Stanford, 
181 S.W.2d at 273; cf. Christensen, 529 U.S. at 587 (stating that agency 
opinions are entitled to respect to the extent of their power to 
persuade).

[16] See Balandran v. Safeco Ins. Co. of Am., 972 
S.W.2d 738, 741 (Tex. 1998). As we have noted before, reasonable people 
sometimes disagree about what is reasonable. See City of Keller v. 
Wilson, 168 S.W.3d 802, 828 (Tex. 2005).

[17] See Downs, 81 S.W.3d at 807 (“[T]hat the 
Commission agrees with Continental’s construction of the statute does not make 
that construction any more persuasive.”). 

[18] See Couch on Insurance 3d § 21.13 (“If, 
however, ambiguous words are to be construed in light of the extrinsic evidence, 
or of the surrounding circumstances, the meaning of such words becomes a 
question of fact for the jury.”); see also Foreca, S.A. v. GRD Dev. Co., 
758 S.W.2d 744, 746 (Tex. 1988).

[19] See Hudson Energy Co., 811 S.W.2d at 
555.

[20] Balandran, 972 S.W.2d at 741; Liberty 
Mut. Ins. Co. v. Am. Emp. Ins. Co., 556 S.W.2d 242, 245 (Tex. 1977); Pan 
Am. Life Ins. Co. v. Andrews, 340 S.W.2d 787, 790 (Tex. 
1960).

[21] 530 S.W.2d 138 (Tex. Civ. App.—San Antonio 1975, writ 
ref’d).

[22] Id. at 141 (citations omitted) (emphasis 
added).

[23] See Tex. 
R. App. P. 56.1(c); Hubenak v. San Jacinto Gas Transmission Co., 
141 S.W.3d 172, 181 (Tex. 2004); Texas Utils. Elec. Co. v. 
Timmons, 947 S.W.2d 191, 199 (Tex. 1997).

[24] See Daniel 6:12; 4 Matthew Henry’s Commentary 1067 (“The 
Persians magnified the wisdom of their king, by supposing that whatever law he 
solemnly ratified it was so well made that there could be no occasion to alter 
it, or dispense with it, as if any human foresight could, in framing a law, 
guard against all inconveniences.”).

[25] See Grapevine Excavation, Inc. v. Md. Lloyds, 35 
S.W.3d 1, 6 (Tex. 2000) (Gonzalez, J., concurring) (“[E]nacting statutes is 
within the unique province of the Legislature, and as to statutes, the ultimate 
interpretation is within their hands”); accord, Quill Corp. v. North 
Dakota, 504 U.S. 298, 320 (1992) (Scalia, J., concurring) (citing 
Patterson v. McLean Credit Union, 491 U.S. 164, 172‑173 (1989) 
(“Considerations of stare decisis have special force in the area of statutory 
interpretation, for here, unlike in the context of constitutional 
interpretation, the legislative power is implicated, and Congress remains free 
to alter what we have done.”)). 

[26] The Fiesses recovered under a separate policy for mold 
caused by Tropical Storm Allison, and failed to preserve a claim for mold caused 
by air‑conditioning and plumbing leaks. See Fiess, 392 F.3d at 804, 807. 


[27] See Finley v. U.S., 490 U.S. 545, 565 n.18 
(1989) (noting Friendly “is universally recognized...as one of our wisest 
judges”); Paul Freund, In Memoriam: Henry J. Friendly, 99 Harv. L.R. 1709, 1715 (noting Friendly 
“was not merely a legend in his own time...”); Richard A. Posner, id. at 
1724 (“He was the greatest federal appellate judge of his time ‑ in analytic 
power, memory, and application perhaps of any time. His opinions have exhibited 
greater staying power than that of any of his contemporaries on the federal 
courts of appeals.”).

[28] See Aetna Cas. & Sur. Co. v. Yates, 344 F.2d 
939, 941 (5th Cir. 1965) (construing clause stated in part stating that 
exclusions “shall not apply to ensuing loss caused by . . . water damage”). 


[29] Gustafson v. Alloyd Co., 513 U.S. 561, 575 
(1995) (noting that the purpose of this rule is “to avoid ascribing to one word 
a meaning so broad that it is inconsistent with its accompanying words.”); 
see also Black’s Law 
Distionary 1087 (8th ed. 2004) (“[Latin for ‘it is known by its 
associates’] A canon of construction holding that the meaning of an unclear word 
or phrase should be determined by the words immediately surrounding 
it.”).

[30] Webster’s New 
Collegiate Dictionary 835 (9th ed. 1985).

[31] That is, 22 x 3 x 22 ‘ 1,452. See Sheldon Ross, A First Course in Probability 2‑3 (7th 
ed. 2006) (noting that multiplying possibilities of each of a sequence of events 
produces the total possible outcomes). It is true that some combinations are 
unlikely, such as wear-and-tear followed by glass breakage that causes mice. But 
with 1,452 to choose from, no doubt plenty of options remain.

[32] For example, 
decisions in a number of jurisdictions address ensuing-loss clauses containing 
the same three intervening causes (building collapse, water damage, and glass 
breakage) as the HO-B policy. See, e.g., Souza v. Corvick, 
441 F.2d 1013, 1016 (D.C. Cir. 1970); N.Z. Ins. v. Lenoff, 315 F.2d 95, 
95 n.1 (9th Cir. 1963); Beach v. Middlesex Mut. Ass. Co., 532 A.2d 1297, 
1298 n.1 (Conn. 1987); Phoenix Ins. Co. v. Branch, 234 So.2d 396, 398 
(Fla. Dist. Ct. App. 1970); Nationwide Ins. Co. v. Warren, 675 S.W.2d 
402, 403 (Ky. Ct. App. 1984); Shields v. Pa. Gen. Ins. Co., 488 So.2d 
1252, 1253 (La. Ct. App. 1986); Cantrell v. Farm Bureau Town & Country 
Ins. Co. of Mo., 876 S.W.2d 660, 662 (Mo. Ct. App. 1994); Umanoff v. 
Nationwide Mut. Fire Ins., 442 N.Y.S.2d 
892, 893 (N.Y. Civ. Ct. 1981).

[33] See Nat’l Union Fire Ins. Co. v. CBI Indus., 907 
S.W.2d 517, 522 (Tex. 1995).

[34] See Schloss v. Cincinnati Ins. Co., 54 F. Supp. 
2d 1090, 1098 (M.D. Ala. 1999), aff’d, 211 F.3d 131 (11th Cir. 
2000).

[35] See Cooper v. Am. Family Mut. Ins. Co., 184 F. 
Supp. 2d 960, 964 (D. Ariz. 2002).

[36] See Murray v. State Farm Fire & Cas. Co., 
219 Cal. App. 3d 58, 65 (Cal. Ct. App. 1990).

[37] See Church of the Palms‑Presbyterian 
(U.S.A.), Inc. v. Cincinnati Ins. Co., 404 F. Supp. 2d 1339, 1342 (M.D. Fla. 
2005).

[38] See Bd. of Educ. of Maine Township v. Int’l Ins. 
Co., 684 N.E.2d 978, 984 (Ill. App. Ct. 1997).

[39] See Ames Privilege Assocs. Ltd. P’ship v. Utica Mut. 
Ins. Co., 742 F.Supp. 704, 708 (D. Mass. 1990).

[40] See Myers v. State Farm Fire & Cas. Co., 
2002 WL 1547673 *6 (Minn. Ct. App. July 16, 2002).

[41] See Narob Dev. Corp. v. Ins. Co. of N. Am., 631 
N.Y.S. 155 (N.Y. App. Div. 1995).

[42] See Alwart v. State Farm Fire & Cas. Co., 
508 S.E.2d 531, 533-34 (N.C. Ct. App. 1998).

[43] See Weeks v. Coop. Ins. Cos., 817 A.2d 292, 296 
(N.H. 2003).

[44] See Boughan v. Nationwide Prop. & Cas. Co., 
2005 WL 126781 *3 (Ohio Ct. App. Jan. 24, 2005).

[45] See Banks v. Allstate Ins. Co., 1993 WL 40113 *5 
(E.D. Pa. Feb. 12, 1993).

[46] See Vt. Elec. Power Co., v. Hartford Steam Boiler 
Inspection and Ins. Co., 72 F. Supp. 2d 441, 445 (D.Vt. 
1999).

[47] See McDonald v. State Farm Fire & Cas. Co., 
837 P.2d 1000, 1005-06 (Wash. 1992).

[48] See Richland Valley Prod. Inc. v. St. 
Paul Fire & Cas. Co., 548 N.W.2d 127, 133 (Wis. Ct. App. 1996). But 
see Phillips v. United Services Auto. Ass'n, 146 S.W.3d 629, 635-36 (Tenn. 
Ct. App. 2004) (holding rot, though excluded clause, was covered by ensuing-loss 
provision).

[49] See Weiner v. Wasson, 900 S.W.2d 316, 320 
(Tex. 1995).

[50] E. Texas Fire Ins. Co. v. Kempner, 27 S.W. 122, 
122 (Tex. 1894).

[51] Weiner, 900 S.W.2d at 320 (“[T]he legitimacy of 
the judiciary rests in large part upon a stable and predictable decision making 
process that differs dramatically from that properly employed by the political 
branches of government.”).