**Joseph CANTRELL and Betty Cantrell, Respondents,**

v.

**FARM BUREAU TOWN & COUNTRY INSURANCE COMPANY OF MISSOURI, Appellant.**

**No. WD 47494.**

Missouri Court of Appeals, Western District.

March 22, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 3, 1994.

Application to Transfer Denied June 21, 1994.

Ronald R. McMillin, R. Max Humphreys, Carson & Coil, P.C., Jefferson City, for appellant.

Sylvester Powell, Jr., Lance W. LeFevre, Heilbron & Powell, Kansas City, for respondents.

Before KENNEDY, P.J., and ULRICH and SPINDEN, JJ.

PER CURIAM.

Farm Bureau Town & Country Insurance Company (Farm Bureau) appeals the judgment in favor of Joseph and Betty Cantrell, husband and wife, entered following jury verdict. The ultimate issue is whether the Farm Bureau insurance policy that insured the Cantrells' home against fire damage insured the home against permeation of residual, noxious fumes resulting from a fire to the home. Farm Bureau also complains that the verdict finding instructions breached Supreme Court Rule 70 which requires instructions to be "simple, brief, impartial, free from argument," and not "require findings of detailed evidentiary facts." Finally, Farm Bureau claims that admission of the Cantrells' medical problems and expenses incurred as a result of their residing in the house following the fire after reconstruction was irrelevant to prove the uninhabitability of the home.

The judgment is affirmed.

On December 17, 1989, fire burned a portion of the home owned by Joseph and Betty Cantrell in Cass County. The fire was confined to a room that contained a pool filter and heat pump for the indoor swimming pool, thirty pounds of chlorine tablets, two gallons of muriatic acid, and certain PVC pipe and polyurethane foam. Chemical reactions resulted as these substances burned. Toxic smoke and assorted fumes resulting from the fire were released into the home. Freon gas was also released from the air conditioning unit during the fire.

When the fire occurred, the Cantrells' home, a four-year-old 8,700 square foot structure,[1] was insured by an "all risk, type three" fire insurance policy issued by Farm Bureau. The Cantrells claimed damage to contents totaling $13,153. Clean-up costs totaled $7,536. Repair to the structure of the home totaled $22,310.36. Living expenses during reconstruction totaled $11,000, and an additional cleaning expense of $5,588.33 was claimed. Farm Bureau paid these sums.

The value of the home before the fire was $430,000. After repair of the house following the fire, the house appeared as it had before the fire.

On or about August 17, 1990, the Cantrells submitted an additional proof of loss to Farm Bureau requesting payment of $458,000. The Cantrells contended their house was a total loss as a result of the fire that occurred on December 17, 1989. Farm Bureau rejected the claim, and this lawsuit resulted.

The Cantrells presented evidence at trial that their house was uninhabitable. After the fire, and before reconstruction, the Cantrells lived in their house. Several days after the fire, they began to experience nausea and headaches. They went to Arizona for a time, and while away from their home did not experience nausea and headaches. After returning to their home and residing in it, their eyes burned, they suffered severe headaches, diarrhea, stomach cramps and dizziness. These phenomena became more severe.

---

1. The Cantrell house was of an "envelope" design. For energy efficiency, the house was essentially one house built inside another with a small "dead" space between the double walls.

They recognized that when they left their house for a few days, they experienced some relief. They observed that trees and plants inside their home died. Their pet cats vomited, and they found dead mice on the premises. A "black, sooty oily substance" appeared on the inner walls of the house, on the kitchen counter, and on the top of the refrigerator and piano. Both their adult son and a young grandson manifested health complications when they were in the house for extended periods of time.

Tests were conducted of dust particles collected inside the Cantrell home. A chemical engineer and certified industrial hygienist testified that tests disclosed toluene, xylene, ethyl methyl benzene, dioxins and chloride. He testified that all were detrimental to health. The witness had advised the Cantrells to stay out of the house. He estimated that fifty to one hundred years were necessary for the chemicals discovered in the house to dissipate and for the house to be inhabitable. He testified that the presence of the chemicals was the result of the fire on December 17, 1989.

A second expert testified. This person was a hazardous material specialist who stated that the resultant chemical fumes emitted by the December 17, 1989, fire negatively impact on the human body. He testified that the resultant fumes permeated the house and are residual. To comply with EPA regulations, the house must be destroyed, he said.

Other experts testified. A medical doctor, testifying as a pulmonary expert, related the Cantrells medical problems to the residual chemicals infesting the house. An expert in pharmacology and toxicology testified that he examined the reports of the tests on particles found in the house after the fire, and he stated that the fire engulfing the chemicals present produced many toxic materials that cannot be identified. He stated that all such products were detrimental to health, and he opined that the house is uninhabitable until the products of the fire dissipate. He estimated that one hundred years would be required before the substances produced by the fire would totally dissipate.

Verdict and judgment were rendered for the Cantrells, and Farm Bureau appealed from the judgment.

### Point I

■ Farm Bureau claims that the trial court erred in overruling its motion for judgment notwithstanding the verdict, asserting that as a matter of law, the Cantrells' claim was excluded under the policy. Farm Bureau asserts that the Cantrells' loss, for which they are making claim, resulted from contamination caused directly or indirectly by the fire, and that contamination is excluded under the policy. Applicability of the contamination exclusion in the policy was a legal question for the trial court.

The policy is an "all risk, type three" policy that insures all loss unless specifically excluded by the policy. The applicable language of the policy states:

**We** cover all accidental direct loss to property insured under level three protection as shown on the Information Page. This protection is subject to the General Exclusions, plus loss resulting directly or indirectly from the following is not covered:

1. WEAR AND TEAR, marring or scratching; deterioration; inherent vice; latent or inherent defect; mechanical breakdown; rust; mold; wet or dry rot; *contamination;* smog; smoke from agricultural smudging or industrial operations; settling, cracking, shrinkage, bulging or expansion of pavement, patios, foundations, walls, floors or ceilings; birds, vermin, rodents, insects or domestic animals. (emphasis added).

. . . .

**We** *cover direct loss not otherwise excluded* in this policy, that follows *caused by fire, smoke* (but not smoke from agricultural smudging or industrial operations), explositon, [sic] collapse of a building, glass breakage or water. (emphasis added).

Farm Bureau contends that inclusion of the word "contamination" excludes it from liability for the permeation of noxious and/or toxic chemicals throughout the house regard-

less of the cause or source. The word "contamination" is not defined or explained in any part of the policy.

"Insurance policies are to be given a reasonable construction and interpreted so as to afford coverage rather than to defeat coverage." *Nixon v. Life Investors Ins. Co. of Am.*, 675 S.W.2d 676, 679 (Mo.App.1984). "Insofar as an insurance policy is open to different constructions, that most favorable to the insured must be adopted." *Id.*

■ Courts enforce insurance policies as written, absent an applicable statute of limitation or public policy requiring coverage, provided the intent of policy language to cover or exclude coverage is plain and the language is unambiguous. *Rodriguez v. General Accident Ins. Co. of Am.*, 808 S.W.2d 379, 382 (Mo. banc 1991); *Nixon*, 675 S.W.2d at 679. When the language of an insurance policy is reasonably and fairly open to different constructions, not in isolation but reading the policy as a whole, it is ambiguous. *Nixon*, 675 S.W.2d at 679.

■ Examination of the entire exclusions clause, to determine what a reasonable reader would understand, creates the image of natural, gradual or inherent sources or forces causing the excluded items listed in the clause. The list of conditions includes those caused by natural means such as: the settling, cracking, shrinking, bulging or expansion of pavement, patios, wall, foundations, or floors; or conditions caused by birds, vermin, rodents, insects or domestic animals. The list also includes conditions from gradual/inherent forces such as wear and tear, marring, scratching, deterioration, inherent vice, mechanical breakdown, latent/inherent defect, rust, mold, wet or dry rot. The list also includes conditions resulting from gradual external sources such as smog and smoke from agricultural smudging or industrial operations. This clause does not suggest conditions resulting from or caused by an insurable event. For example, an explosion could cause cracking or bulging of walls and foundations, yet the exclusion section would not give a reasonable person the notion that re-

sulting damage in the nature of cracking or bulging would not be covered. None of the exclusions result from normally insurable events. The word "contamination" as it appears within the exclusions subsection, is not unambiguous.[2] Therefore, whether, as a matter of law, contamination of the house from the smoke and/or fumes of the fire is excluded from the policy coverage must be determined. Where ambiguity exists and it is necessary to determine the extent of coverage, application of the proximate cause analysis is appropriate. *Madison Block*, 620 S.W.2d at 346.

In *Garvey v. State Farm Fire and Casualty Company*, 48 Cal.3d 395, 257 Cal.Rptr. 292, 296, 770 P.2d 704, 708 (1989), the California Supreme Court adopted a test applied by a California appellate court in *Sabella v. Wisler*, 59 Cal.2d 21, 27 Cal.Rptr. 689, 377 P.2d 889 (1963), that:

> [D]etermining whether a loss is within an exception in a policy, where there is a concurrence of different causes the efficient cause—the one that sets others in motion—is the cause to which the loss is to be attributed, though the other causes may follow it and operate more immediately in producing the disaster.

This reasoning is harmonious with this court's reasoning in *Carriage Club, Inc. v. American Motorists Insurance Co.*, 643 S.W.2d 38 (Mo.App.1982).

The *Carriage Club* case resulted from the 1977 Plaza flood. A claim had been paid for damage to the insured's tennis courts under an endorsement which removed a flood exclusion from an all risk policy. When additional cracks were discovered the following Spring, the insurer refused further coverage on the grounds that the additional cracks had been caused by heaving of the soil when water froze under the court. Damage due to earth movement, settling, cracking, shrinkage, or expansion of pavements was excluded from coverage. It was undisputed that the flood had deposited excess moisture in the soil beneath the courts and that the cracks in the

---

**2.** *See Madison Block Pharmacy, Inc. v. United States Fidelity & Guaranty Co.*, 620 S.W.2d 343, 346 (Mo. banc 1981) (question of proximate cause of a loss not reached until it is determined whether the exclusionary language clearly and unambiguously precludes recovery).

tennis courts were caused when that moisture froze and the pressure of the ice and of the surrounding soil caused the courts to move. This court determined that the exclusions were not intended to deny coverage for damage that resulted from a covered event— the flood. The water that caused the cracking and expansion was placed under the tennis courts by the flood. The flood was a covered event, and despite the later events of freezing and melting which directly caused the cracking and bulging, the flood placed the excess water under the tennis courts and, using the *Garvey/Sabella* language, the flood was the efficient cause of the eventual cracking. The exclusions listed for cracking and expansion did not invalidate full coverage for a covered event.

In *Madison Block*, a boat navigating flood water crashed through the insured pharmacy's door allowing flood water to enter and cause damage to the interior. Direct loss to the front door from contact with the boat was covered. The exclusion in the all risk policy stated, "this policy does not insure ... against ... loss caused by, resulting from, contributed to or aggravated by any of the following: ... flood, surface waters, waves ... overflow of streams or other bodies of water." *Madison Block*, 620 S.W.2d at 344. The Missouri Supreme Court in *Madison Block* found that this language clearly and unambiguously excluded the damage caused by the entering flood water even though the boat's contact with the front door was a contributing factor in allowing the flood waters to enter. *Id.* at 345. Since the language in the *Madison Block* exclusion was so clear and unambiguous, the court did not need to look to the proximate cause or the efficient cause of the loss. The efficient cause of the *Madison Block* damage was the flood water. The flood water set in motion the other event, the boat navigating the street. In addition, were it not for the flood, a vehicle striking the door could not have caused flood damage to the interior.

In *Carriage Club*, the exclusion was ambiguous, and this court, therefore, looked to the proximate cause. There was no apparent contention in *Carriage Club* that the words "earth movement; settling, cracking, shrink-

age or expansion of pavements; and/or damage to pavements caused by water pressure or ice," did not include the cracking of the tennis courts. Because the exclusionary language was not unambiguous, this court looked to the efficient cause.

Farm Bureau argues that merely placing the word contamination in the list of exclusions removes from coverage any damage that could be considered contamination in the broad meaning of the word despite the type or origin of the contamination. Farm Bureau cites a dictionary definition of contamination to prove the common meaning of the word. The definition Farm Bureau cites is "to make inferior or impure by admixture." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (Merriam–Webster, 1987).

Permeation of the house with toxic or noxious smoke and/or fumes would fit this very broad definition. However, there may be many conceivable types and sources of contamination. Four different potential sources or types are identifiable. *Gradual* contamination from unknown or various external sources, or gradual contamination from natural sources is the first type. Examples of this type of contamination would be pollution, contamination from radon or other noxious natural sources, contamination from exposure to raw sewage or chemicals used as pesticides or herbicides. The second type is the potential contamination from *activities* or events not occurring on the insured's property, such as nuclear radiation, or toxic gas resulting from an accident or mishap. The third type is contamination resulting from an *uncovered event* or activity occurring on the insured's property, such as the negligent or malicious saturation of a floor or wall with chemicals designed for use as pesticides or fertilizers. Contamination directly resulting from a *covered event* occurring on the insured's premises is the fourth type. Normal smoke damage to unburned parts of a house that was partially damaged by fire is an example of the fourth type.

Smoke damage, by the definition cited by Farm Bureau, would be contamination. The smoke has made the other parts or contents of the house "inferior or impure by admixture." If the word contamination were to be

given the broad, all-encompassing definition advanced by Farm Bureau, smoke damage of any type would have to be excluded from Farm Bureau's type three coverage. The policy states: "We cover direct loss not otherwise excluded in this policy, that follows caused by fire, smoke (but not smoke from agricultural smudging or industrial operations). . . ." If contamination were intended to include any impurity caused by admixture, smoke damage could never be covered because of the "not otherwise excluded" language.[3]

The exclusion section does not clearly exclude contamination resulting from a covered event. A reasonable person reading the exclusion would expect the first two types of contamination to be the types of contamination excluded. The other types of items listed in the exclusions section are of similar nature to the first and second types listed above. Whether the third type of contamination is covered is less certain, but an argument can be made that a reasonable person would also understand the third type of contamination would not be covered.[4] The first three types of contamination involve contamination without occurrence of a covered event. However, a reasonable person would not determine that smoke damage caused by a covered fire, would be excluded from coverage.

The premise that type four contamination is not excluded by the policy is supported by analysis of other types of damage specifically excluded but for the cause of the damage being a covered event. For example, no reasonable person would expect that if the heat from a fire in a room within the house were so intense that the floor above the burned room cracked, bulged or settled as a direct result, that the policy would not cover the repair or replacement of that floor as well as the burned room, despite the exclusion for "cracking, bulging" or for "settling" of "floors or ceilings."

In this case, the smoke that caused the damage was laden with toxic materials which, according to the jury's verdict, rendered the house uninhabitable. As a matter of law, the word "contamination" as it appears in the exclusions section, when considered in the section as a whole, does not exclude coverage for the damage to the Cantrell home caused by the toxic smoke directly and necessarily resulting from the covered fire. Point one is denied.

### Point II

For its second point on appeal, Farm Bureau contends that the trial court erred in overruling its motion for a new trial because jury instruction number five was in violation of Rule 70. Supreme Court Rule 70 requires that instructions be "simple, brief, impartial, free from argument," and not "require findings of detailed evidentiary facts."

The Cantrells assert that this issue was not properly preserved. Reversal is not granted for instructional error unless prejudice is demonstrated. *Crabb v. Mid-American Dairymen, Inc.,* 735 S.W.2d 714, 718 (Mo. banc 1987) (citing *Hudson v. Carr,* 668 S.W.2d 68, 71 (Mo. banc 1984)). If counsel believes that a proposed instruction may confuse or affect a jury, "counsel has the opportunity to suggest modification or to submit alternatives at the instruction conference." *Crabb,* 735 S.W.2d at 718. "Although objection at that time is not necessary to preserve error (Rule 70.03), its absence may be considered in assessing prejudicial effect." *Id.* "If a defect is not readily apparent to counsel preparing to argue the case, it is unlikely the jury will be confused or misled." *Cornell v. Texaco, Inc.,* 712 S.W.2d 680, 682 (Mo. banc 1986).

---

3. The policy, as it speaks of coverage for direct smoke damage, repeats the smoke exclusions, "smoke from agricultural smudging or industrial operations" listed in the exclusion section despite the language "not otherwise excluded," which Farm Bureau claims allows any contamination resulting from fire or smoke to be excluded from coverage.

4. This would be the type of contamination in *Auten v. Employers National Insurance Company,* 722 S.W.2d 468, (Tex.App.1986), where the insureds sought coverage for misapplication of pesticides in their home by a professional exterminator.

In the instruction conference, when the court asked for specific objections to the instructions, Farm Bureau objected to the verdict director, asserting it was not supported by any evidence. Later in the instruction conference Farm Bureau's counsel said:

MR. HUMPHREYS: Judge, on the verdict director, also they have language in there about uninhabitable or unusable. I think the instruction should just say "total loss," period. That other language is extraneous.

Mr. McMILLIN: In addition to that reasoning, the issue would be whether or not it's a total loss to anyone, to a reasonable person, or somebody other than just these plaintiffs, and that particular instruction does not make that clear.

Other than Farm Bureau's general objections to each and every instruction submitted by the Cantrells, these statements of counsel are the only comments that may constitute specific objections to Instruction number five. The objections, with the Motion for New Trial,[5] suffice to preserve the issue for appeal even though the objections at the instruction conference may not have been specific enough for the court to have corrected or clarified Instruction number five had it been confusing, argumentive or if the instruction had required the jury to assume an ultimate fact.

█ The ultimate (and only) issue for the jury was whether permeation of the toxic smoke and fumes caused the house and its contents to be a total loss. The court, and not the jury, determined as a matter of law, that the contamination exclusion discussed under point one did not exclude the loss from coverage.

Plaintiffs' verdict directing Instruction number five was a modified version of MAI 31.09 and was submitted as follows:

5. Farm Bureau, in its Motion for New Trial, was specific in listing that Farm Bureau alleged error in that Instruction 5 did not submit the ultimate fact to the jury, but rather had the jury assume the ultimate fact. *See* Rule 70.03.

6. MR. HUMPHREYS: [w]hat I understand the way you're instructing is all or none; if it's not a total loss you get zero.

Your verdict must be for plaintiff if you believe:

First, defendant issued its policy to plaintiffs covering loss due to fire, and

Second, such property was damaged by fire, and

Third, as a direct result of such fire toxic chemicals permeated the house and contents thereof and remain therein thereby making the structure uninhabitable, and therefore a total loss, and the contents unusable.

Farm Bureau argues that the ultimate issue was whether the house was a total loss. It maintains that Instruction number five causes the jury to assume the ultimate fact. Farm Bureau claims that if the jury finds the toxic chemicals permeated the house, remained, and thereby made the structure uninhabitable, the instruction tells them they must assume the house is therefore a total loss.

Instruction number six stated:

Your verdict must be for defendant unless you believe plaintiffs suffered a total loss of their property.

Instruction seven read:

The phrase "total loss" as used in these Instructions means that the building and contents are so damaged that no substantial remnant remains that an ordinary, reasonable and prudent uninsured person would use for rebuilding or restoration.

Farm Bureau and the Cantrells agreed that the case would be "all or nothing."[6] Instruction number eight stated that if the jury found in favor of the Cantrells they *must* award them the sum of $373,000 for the loss of the house and the sum of $113,220 for the loss of its contents, plus interest on the above at the rate of nine percent per annum from October 5, 1990. The case was argued

MR. LEFEVRE: That's the way the instructions read.

THE COURT: Yeah, they're stipulating and agreeing that if the jury finds that the house is habitable then they recover zero, is that correct?

MR. LEFEVRE: That's my understanding of the theory of the case.

as a total loss case. Viewed with all the other facts, testimonies and arguments by counsel for both sides, the jury was not confused as to the ultimate issue. *See Welch v. Hyatt,* 578 S.W.2d 905, 914 (Mo. banc 1979).

The jury, particularly with instructions six and seven before it, was not confused by instruction five. Nor was instruction five in violation of Rule 70. Instruction five was not too long or complex, nor was it argumentive. Each element that the jury must believe to find for the Cantrells was set apart by a comma and the conjunction "and." The jury, if it believed that as a direct result of the covered fire, the house was so permeated with toxic chemicals that it was and remains uninhabitable, would understand that to find for the Cantrells it must also believe that those things made the house a total loss as defined by Instruction seven. If the jury found that the house was uninhabitable but that somehow the house was not a total loss, Instruction six would have guided its verdict. If any error existed, it was not prejudicial. Point two is denied.

### Point III

■ For its last point on appeal, Farm Bureau argues that the trial court erred in admitting evidence of the Cantrells' medical conditions and expenses. Farm Bureau insists that the test for habitability is an objective one and the subjective responses of the Cantrells were irrelevant and should not have been allowed into evidence.

■ "The trial court is granted broad discretion in admitting or rejecting evidence on relevancy grounds." *Missouri Commercial Inv. Co. v. Employers Mutual Casualty Co.,* 680 S.W.2d 397, 402 (Mo.App.1984). Appellate courts will disturb such rulings only if the trial court abused its discretion. *Sharaga v. Auto Owners Mutual Ins. Co.,* 831 S.W.2d 248, 256 (Mo.App.1992). The Cantrells were required to prove uninhabitability to prove total loss. Much objective evidence was presented by experts. The actual damages suffered by the Cantrells, their son, grandson and their cats were logically relevant to prove that the house was not habitable. "The test for relevance is whether an offered fact tends to prove or disprove a fact in issue or corroborates other relevant evidence which bears on the principal issue." *State ex rel. Webster v. Missouri Resource Recovery, Inc.,* 825 S.W.2d 916, 942 (Mo.App. 1992). The subjective medical damages and expenses supported the objective evidence offered and aided the jury in understanding the nature of the toxic house and in comprehending the reality of its perils. Point three is denied. The judgment of the trial court is affirmed.

All concur.