472 F.3d 33
 PARKS REAL ESTATE PURCHASING GROUP, Parks Associates Real Estate, Inc., Parks & Associates Real Estate Ltd., Mazal Group, L.L.C., Parks Associates Real Estate, and Newmark & Company Real Estate, Plaintiffs-Appellants,
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant-Appellee, and
National Union Fire Insurance Company of Pittsburgh and Great Northern Insurance Company, Defendant.
Docket No. 05-5890-CV.
 United States Court of Appeals, Second Circuit.
 Argued: June 22, 2006.
 Decided: December 21, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Joshua L. Mallin (Lisa N. Wall, on the brief), Weg & Myers, PC, New York, NY, for Plaintiffs-Appellants.
 Lon A. Berk (Syed S. Ahmad, on the brief), Hunton & Williams, LLP, McLean, VA, for Defendant-Appellee.
 Before: MINER and CALABRESI, Circuit Judges, and RESTANI, Chief Judge, U.S. Court of Int'l Trade.*
 MINER, Circuit Judge:
 
 
 1
 Plaintiffs-appellants Parks Real Estate Purchasing Group, Parks Associates Real Estate, Inc., Parks & Associates Real Estate Ltd., Parks Associates Real Estate, Mazal Group, LLC, Newmark & Company Real Estate (collectively, "Parks") appeal from a summary judgment entered in the United States District Court for the Southern District of New York (Preska, J.). The action was brought to recover under a first-party property insurance contract (the "Policy") between Parks and defendant-appellee St. Paul Fire and Marine Insurance Company ("St.Paul"). Among the properties insured by the Policy was a building at 90-100 John Street in New York City (the "Building" or "Property"). On September 11, 2001, as a result of the World Trade Center collapse, a cloud of noxious particulate matter spread throughout the downtown New York City area where the insured Building is located. The particulate matter apparently penetrated the Building and settled in its mechanical and electrical systems. In this action, Parks also sought to recover on claims against defendants National Union Fire Insurance Company of Pittsburgh, Pennsylvania, and Great Northern Insurance Company under policies of insurance issued by those companies, but those claims were dismissed. Following discovery, St. Paul submitted a motion for summary judgment, arguing that Parks' claims for damage to the insured Building were foreclosed by the contamination exclusion in the Policy. Parks argued that the damage to the insured Building was not caused by contamination within the meaning of the contamination exclusion provision.
 
 
 2
 In granting summary judgment in favor of St. Paul, the District Court determined that the particulate matter from the World Trade Center collapse created a condition of impurity that rendered the building unfit for use by the introduction of unwholesome elements. The court determined this damage was properly considered contamination for purposes of the contamination exclusion clause in the Policy, and St. Paul was entitled to deny coverage for the loss claimed by Parks. The District Court also found that the dominant efficient cause of the loss was not the collapse of the World Trade Center but the infiltration of the building by the particulate matter created by the collapse. For the reasons that follow, we vacate the judgment of the District Court and remand for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 3
 The collapse of the World Trade Center Twin Towers occasioned by the terrorist attack of September 11, 2001 caused a cloud of particulate matter consisting of the pulverized contents of the fallen Towers to spread throughout downtown Manhattan. The pulverized contents included "hydroxyls (high pH), chlorides, sulfates, organics, asbestos, lead, mercury, cadmium, quartz, beryllium, and mineral wood." The insured Building was located a few blocks from the World Trade Center.
 
 
 4
 At the time of the September 11 attack, the Policy provided that St. Paul would "[p]rotect covered property against risks of direct physical loss or damage except as indicated in the Exclusions — Losses We Won't Cover section." Relevant to this appeal, the Policy went on to state in pertinent part that St. Paul would cover the Parks' "financial interest in the covered building or structure," and, specifically, "machinery and equipment that are a permanent part of a building and are used to provide building services such as elevators and heating equipment." Also covered were "fixtures or yard fixtures," property owned "to service or maintain" the insured building, and "construction materials, supplies, and equipment" intended to be used for repairing, modifying, or expanding the insured building.
 
 
 5
 The exclusions listed in the Policy included the contamination exclusion, which stated that "[St. Paul would not] cover loss or damage caused by or made worse by any kind of contamination of . . . products or property covered by this insuring agreement. If a loss not otherwise excluded results, [St. Paul will] pay for that resulting loss." Further, the Policy contained an exclusion entitled "Wear — tear — deterioration — animals" (the "Wear and Tear Exclusion"), which provided, in material part, that: "[St. Paul will not] cover loss caused or made worse by . . . corrosion." Also listed in the Policy was a mechanical breakdown exclusion (the "Mechanical Breakdown Exclusion"), providing that St. Paul would not cover loss of "covered property caused or made worse by mechanical breakdown or failure."
 
 
 6
 On September 18, 2001, Parks provided St. Paul with a Proof of Loss, notifying St. Paul that the insured Building had sustained damage in the amount of $16,594,118.00 and a business interruption loss in the amount of $1,791,002.34. Parks claimed that the insured Building had sustained severe and extensive damage resulting from the collapse of the World Trade Center. Specifically, Parks claimed that the cloud of particulate matter and dust infiltrated the interior and exterior of the Property. This damage, according to Parks, was in the form of "corrosion, destruction, excessive wear, increased maintenance and repair of the architectural façade, mechanical, electrical, structural and Heat Ventilation and Air Conditioning (`HVAC') systems and other equipment and machinery including computers and related hardware pertaining to and comprising the . . . Property and its surrounding environs."
 
 
 7
 Shortly after receipt of the notice of proof of loss, St. Paul investigated the claim and eventually advanced a payment of $1,915,914 to Parks. Parks contended that this payment did not fully cover its losses and that St. Paul had breached the Policy. Accordingly, Parks filed its Complaint in the Supreme Court of the State of New York, County of New York, on January 15, 2004, seeking to recover the balance of its loss — more than sixteen-million dollars. After interposing its Answer to the Complaint, St. Paul filed a Notice of Removal, by which it succeeded in removing the case to the United States District Court for the Southern District of New York.
 
 
 8
 In its Complaint, Parks alleged that the "particulate matter from the [World Trade Center] infiltrated much of the . . . Property causing damage in the form of erosion, corrosion, destruction, excessive wear, increased maintenance and repair of the architectural façade, mechanical, electrical, structural and Heat Ventilation and Air Conditioning (`HVAC') systems and other equipment and machinery including computers and related hardware pertaining to and comprising the . . . Property and its surrounding environs." Parks alleged that "the elevators, electrical and mechanical systems of its property . . . have been damaged and will continue to be damaged."
 
 
 9
 On December 15, 2004, following discovery, St. Paul moved for summary judgment, arguing inter alia that the alleged damage was "contamination," and, therefore, that the damage Parks suffered was excluded from coverage under the Policy, pursuant to the Contamination Exclusion. In St. Paul's motion for summary judgment, it also argued that the Policy's "Mechanical Breakdown" and "Wear and Tear" exclusions also barred coverage of Parks' losses.
 
 
 10
 Parks argued to the District Court in its memorandum of law in opposition to St. Paul's motion for summary judgment that two independent reasons required denial of summary judgment: (1) the Contamination Exclusion is ambiguous, and the damage sustained was not properly considered caused by contamination in any event; and (2) the efficient cause of the damage was the collapse of the World Trade Center, a covered peril under the Policy.
 
 
 11
 In opposition to St. Paul's motion for summary judgment, Parks referred to the report (the "Report") prepared by Parks' expert, the RJ Lee Group ("RJ Lee"), describing the causes of damage to the insured Building. RJ Lee was retained by Parks to investigate the physical and environmental condition of the Property. In the Report, RJ Lee concluded that the particulate matter from the World Trade Center collapse has an "unprecedented complexity and is pervasively found in all building systems and components, and presents an ongoing source of re-entrainment and thus damage to cleaned or newly installed mechanical systems." The Report included the following findings:
 
 
 12
 The corrosive, abrasive, and hazardous material includes[,] but is not limited to, hydroxyls (high pH), chlorides, sulfates, organics, abestos, lead, mercury, cadmium, quartz, beryllium, and mineral wool, and was found on all floors and in all building systems sampled, in concentrations substantially in excess of those found in non-impacted buildings. Many of these substances are known toxins or carcinogens individually: little is known about the magnitude of the collective threat to human health, except that it will be greater than the threat from the individual substances. In the Building's current condition, accelerated cleaning programs will need to be employed to ensure that long-term risk to occupants is minimized.
 
 
 13
 RJ Lee also noted in its Report that the "functionality of building systems has been damaged by the infiltration of corrosive, abrasive, and hazardous [World Trade Center] [p]articulate forced into the Building by the collapse of the [World Trade Center]." Thus, the Report found, "[p]remature equipment failures and incremental maintenance costs have and will continue to impair the functionality and value of the Building and its systems."
 
 
 14
 The Report highlighted specific damage to building systems, components, and equipment as follows:
 
 
 15
 [E]lectronic devices and controls have been and will continue to be adversely affected by the ionic nature (i.e., conductivity) of the [World Trade Center] Particulate, which is responsible for generating leakage currents in the presence of humidity and are a common cause of electronic device failures.... [T]he [World Trade Center] Particulate will also chemically and/or electronically corrode the metallic conductors on electronic devices and cause component failures.
 
 
 16
 . . . [T]he quartz, mineral wool, and glass fibers present in the [World Trade Center] Particulate have been shown to abrade hard ball bearing steel. Abrasion will increase the wear of contaminated moving parts and shorten machinery lifetimes. Smaller affected items such as switches, outlets, circuit breakers[,] and small motors cannot be disassembled for remediation without destroying the equipment.... [T]he life of electromechanical equipment is substantively reduced in abrasive and corrosive environments like that produced by the [World Trade Center] event.
 
 
 17
 Finally, the Report discussed the effects of the particulate matter on the lubricants of the Property's equipment and machinery:
 
 
 18
 [World Trade Center] Particulate was found in components of mechanical and electrical systems. The cement dust, gypsum and chloride present in the particulate will affect the pH and viscosity versus lubricity of the lubricant. The leakage current generated by the particulate will increase the occurrence of motor, switch[,] and circuit failure in a random, non-reproducible manner. Quartz, mineral wool[,] and other particles will cause abrasion. The combination of the above will cause premature [equipment] failure.
 
 
 19
 On September 28, 2005, the District Court granted St. Paul's motion for summary judgment, finding that the Policy's Contamination Exclusion barring coverage for the Property's losses was applicable. Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co., No. 04 Civ. 5201, 2005 WL 2414771 (S.D.N.Y. Sept. 28, 2005). Seeing no ambiguity in the term "contamination," the District Court observed that "contamination" is generally defined as "the introduction of a foreign substance that injures the usefulness of the object," citing Hi-G, Inc. v. St. Paul Fire and Marine Ins. Co., 391 F.2d 924, 925 (1st Cir.1968), or "a condition of impurity resulting from the mixture or contact with a foreign substance," citing Am. Cas. Co. of Reading, Pennsylvania v. Myrick, 304 F.2d 179, 183 (5th Cir.1962). Parks Real Estate, 2005 WL 2414771, at *3. The District Court found that "[c]ourts have even favorably viewed both definitions of contamination simultaneously," citing Richland Valley Prods., Inc. v. St. Paul Fire & Cas. Co., 201 Wis.2d 161, 548 N.W.2d 127, 131 (1996). Parks Real Estate, 2005 WL 2414771, at *3. The District Court then found in the case at bar that "[u]nder either definition outlined above, the facts in the record here describe contamination" because "[t]he airborne particulate matter created as a result of the [World Trade Center] collapse is properly considered either a foreign substance that came into contact with the Property creating a condition of impurity or a foreign substance that, when introduced to the Property, injured the Property's usefulness." Id. at *3.
 
 
 20
 Under the definitions of contamination borrowed from the First and Fifth Circuits and employed by the District Court, the court explained how it was clear that the insured Property in this case was "rendered unfit for use by the introduction of unwholesome or undesirable elements" and that the Property "suffers from a condition of impurity resulting from ... contact with a foreign substance." Id. at *4 (omission in original; quotation marks omitted). The District Court focused on the effect of the particulate matter, reasoning that "[w]hether the airborne substance at issue is considered pulverized, abrasive, corrosive, erosive, particulate or contaminant, the effect on the Property was contamination." Id. at *4.
 
 
 21
 The District Court next determined that "[w]here an insured seeks recovery of a loss for which there are several potential causes, some covered and some not covered under the insurance policy, it is the efficient cause of the loss that will be recognized for purposes of insurance coverage." Id. at *5. The District Court first determined that "the specific language of the Contamination Exclusion makes the actual efficient cause of the loss irrelevant" because that exclusion barred coverage for "damage caused by or made worse by any kind of contamination." Id. at *5. The District Court concluded that
 
 
 22
 [e]ven assuming that the efficient cause of [Parks's] loss was . . . the collapse of the [World Trade Center] and not airborne particulate contamination, there is no doubt that, at the very least, [Parks's] damages were made worse by contamination. Pursuant to the clear language of the exclusion, [St. Paul] will not cover any loss made worse by contamination.
 
 
 23
 Id. at *5 (emphasis omitted). The District Court went on to determine, however, that the collapse of the World Trade Center was not the efficient cause of the loss to the insured Property:
 
 
 24
 [O]n this record it is also clear that the efficient cause of [Parks'] loss was not the collapse of the [World Trade Center] as [Parks] contend[s] but rather the contamination that affected the Property in the wake of the collapse. [Parks] urge[s] the Court to take the efficient cause analysis a step backwards, away from the actual contact of the airborne particulate matter with the Property, and towards the collapse of the [World Trade Center]. Nevertheless, [Parks's] invitation to move beyond the direct cause of the loss — the contamination itself — would lead me down a slippery slope of causation.
 
 
 25
 Once the efficient cause inquiry passes the airborne particulate matter, there is no particular reason to stop at the collapse of the [World Trade Center]. The efficient cause of [Parks'] loss could be the first hijacked plane that struck the [World Trade Center]; it could also be the second. It could be the explosion of the airplanes' fuel tanks, or the resulting fires which caused the [World Trade Center's] structural supports to buckle, or the design of those very supports. It could even be the prevailing winds, or lack thereof, which allowed the particulate matter to reach the Property instead of being held up or indeed sent in the opposite direction....
 
 
 26
 Because efficient cause analysis can become so easily and obviously attenuated, courts look for the dominant, direct cause of the loss, not an event that is merely connected to a result.
 
 
 27
 Id. at *5.
 
 
 28
 The District Court also concluded that the proper efficient cause analysis did not involve a "look at the efficient cause of the contamination" but an examination into the "efficient cause of the loss," which the court found to be the contamination itself — i.e., "the actual contact between the Particulate and the Property." Id. at *6. In other words, the court found that the dominant and efficient cause of the loss was the contamination in and of itself.
 
 
 29
 The District Court also determined that neither the Mechanical Breakdown nor the Wear and Tear Exclusions were applicable. Regarding the Mechanical Breakdown Exclusion, the court found that Parks was not "seeking coverage for loss caused by a mechanical breakdown or failure but for damage caused by a `corrosive and abrasive particulate' which has infiltrated the interior and exterior of the [Property]." Id. at *1 n. 1. As to the Wear and Tear Exclusion, the District Court held that that exclusion was also not applicable to bar coverage, as "[t]he damage was the alleged result of an unexpected and sudden event rather than gradual wear-and-tear." Id.
 
 
 30
 Judgment was entered on September 30, 2005. Parks' timely Notice of Appeal was filed on October 27, 2005. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.
 
 DISCUSSION
 I. Standard of Review
 
 31
 A district court's grant of summary judgment is reviewed de novo. Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir.2005). This Court "utilizes the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998). A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir.1997). In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir.1987). However, with respect to a properly supported summary judgment motion, the party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). This Court reviews a district court's interpretation of a contract de novo. E.g., Lee v. BSB Greenwich Mortgage L.P., 267 F.3d 172, 178 (2d Cir.2001). Questions of law or mixed questions of fact and law are also reviewed de novo. E.g., Hirschfeld v. Spanakos, 104 F.3d 16, 19 (2d Cir.1997).
 
 
 32
 II. Interpretation of Insurance Contracts Under New York Law
 
 
 33
 In this case, St. Paul provided Parks with first-party coverage, which means that the Policy is designed to compensate Parks for damage to its own property. See 2 Ostrager & Newman, Insurance Coverage Disputes § 21.01[a], at 1303 (13th ed.2006) (citing Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 136 (2d Cir.1986) (stating that first-party property insurance policies "provide financial protection against damage to property")). Commercial property insurance generally is offered in the form of either an "all-risk" policy or a "named perils" policy. Under an all-risk policy, "losses caused by any fortuitous peril not specifically excluded under the policy will be covered." Id. § 21.02[a], at 1306 (emphasis supplied) (citing Ingersoll Milling Machine Co. v. M/V Bodena, 829 F.2d 293, 307 (2d Cir. 1987)); see also Murray v. State Farm Fire and Cas. Co., 203 W.Va. 477, 509 S.E.2d 1, 7 (1998) ("Under an all[-]risk policy, recovery is allowed for all losses arising from any fortuitous cause, unless the policy contains an express provision excluding loss from coverage."). See generally J. Draper, Coverage under all-risk insurance, 30 A.L.R. 5th 170, 1995 WL 900253 (1995). "By contrast a `named perils' policy covers only losses suffered from an enumerated peril." Id. (citing Opera Boats, Inc. v. La Reunion Francaise, 893 F.2d 103, 105 (5th Cir.1990)).
 
 
 34
 Here, St. Paul issued to Parks an "all-risk" property insurance policy providing that St. Paul would "[p]rotect covered property against risks of direct physical loss or damage except as indicated in the Exclusions — Losses We Won't Cover section." In this case, we are asked primarily to review the parties' dispute surrounding, and the District Court's interpretation of, one of the exclusions — to wit, the Contamination Exclusion — contained in the all-risk Policy.
 
 
 35
 When a dispute arises involving the terms of an insurance contract, New York insurance law provides that "`an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'" Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir.2000) (quoting Village of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995)); see also Goldberger v. Paul Revere Life Ins. Co., 165 F.3d 180, 182 (2d Cir. 1999). When the provisions are unambiguous and understandable, courts are to enforce them as written. See Goldberger, 165 F.3d at 182. "[T]he initial interpretation of a contract is a matter of law for the court to decide." Morgan Stanley Group Inc., 225 F.3d at 275 (internal quotation marks omitted).
 
 
 36
 Whether a contract is ambiguous, however, is a "threshold question of law to be determined by the court." Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 390 (2d Cir.2005); see also Morgan Stanley Group, Inc., 225 F.3d at 275 ("Part of this threshold interpretation is the question of whether the terms of the insurance contract are ambiguous." (citing Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir.1998))). "An ambiguity exists where the terms of an insurance contract could suggest `more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Morgan Stanley Group Inc., 225 F.3d at 275 (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir.1997)); see also Duane Reade Inc., 411 F.3d at 390 (quoting Morgan Stanley Group Inc. for same). "An insurance policy should be read in light of common speech and the reasonable expectations of a businessperson." Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co., 13 A.D.3d 599, 788 N.Y.S.2d 142, 144 (N.Y.App.Div.2004) (internal quotation marks omitted); accord Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y., 241 A.D.2d 66, 671 N.Y.S.2d 66, 68-69 (N.Y.App.Div.1998) (stating that courts are to construe the terms of an insurance contract as they are used in common speech).
 
 
 37
 Moreover, to "negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon." Throgs Neck Bagels, Inc., 241 A.D.2d at 71, 671 N.Y.S.2d at 69 (internal quotation marks and citation omitted; alteration in original). Under New York insurance law, "[t]he burden, a heavy one, is on the insurer, and [i]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer." Pepsico, Inc., 788 N.Y.S.2d at 144 (internal citations and quotations omitted; second alternation in original); see Seaboard Sur. Co. v. Gillette Co., 64 N.Y.2d 304, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272 (1984) (holding that policy exclusions "are not to be extended by interpretation or implication but are to be accorded a strict and narrow construction" and that any ambiguity will be resolved against the insurer); see also Olin Corp. v. Certain Underwriters at Lloyd's London, 468 F.3d 120, 129 (2d Cir.2006) (examining whether "migrating contamination constitutes additional property damage to trigger liability coverage" and recognizing the general "tenet under New York law that where the precise meaning of insurance policies is ambiguous, their provisions are to be construed in favor of finding coverage").
 
 
 38
 "Once a court concludes that an insurance provision is ambiguous, `the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" Morgan Stanley Group Inc., 225 F.3d at 275-76 (quoting Alexander & Alexander, 136 F.3d at 86; see also Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428-29 (2d Cir.1992)). "If the court concludes that an insurance policy is ambiguous, then the burden shifts to the insurer to prove that its interpretation is correct: if extrinsic evidence is available but inconclusive, the burden shifts at the trial stage." Morgan Stanley Group Inc., 225 F.3d at 276 (citing Union Ins. Soc'y v. William Gluckin & Co., 353 F.2d 946, 951-52 (2d Cir.1965) (remanding for trial in order to allow district court to consider extrinsic evidence before applying contra proferentem)). "[I]n the absence of extrinsic evidence, the burden shifts [to the insurer] at the summary judgment stage." Id. (citing Twombly v. AIG Life Ins. Co., 199 F.3d 20, 25-26 (1st Cir.1999)). Thus, "`[i]f the extrinsic evidence does not yield a conclusive answer as to the parties' intent,' a court may apply other rules of contract construction, including the rule of contra proferentem, which generally provides that where an insurer drafts a policy `any ambiguity in [the] ... policy should be resolved in favor of the insured.'" Id. at 276 (quoting McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir.1994)).
 
 
 39
 III. The Contamination Exclusion Under the Contract
 
 
 40
 Under the "all-risk" Policy in this case, Parks may seek compensation for loss or damage not otherwise excluded. Here, St. Paul asserts that the claimed loss falls under the Contamination Exclusion and therefore is excluded from coverage. The parties agree, as they must, that the term "contamination" is not further defined in the Policy.
 
 
 41
 We recognize that some courts have used the same definitions as the District Court in applying contamination exclusions — i.e., the introduction of a foreign substance that injures the usefulness of the object, see Hi-G, Inc. v. St. Paul Fire & Marine Ins. Co., 391 F.2d 924, 925 (1st Cir.1968) (holding that "a product is commonly spoken of as contaminated when the foreign substance merely injures its usefulness without affecting the original physical characteristics"); J.L. French Auto. Castings, Inc. v. Factory Mut. Ins. Co., No. 1:02CV09479, 2003 WL 21730127 (N.D.Ill. July 23, 2003) (concluding that "contamination — the presence of human remains in the die lubricant — was caused by the operator being crushed in the press"), or "a condition of impurity resulting from the mixture or contact with a foreign substance," see American Cas. Co. of Reading, Pa. v. Myrick, 304 F.2d 179, 184 (5th Cir.1962) (holding that there was a "contamination" of refrigerated foodstuffs that had been "rendered impure" when they came "in contact" with ammonia gas as a result of a broken commercial refrigerator — rendering the foodstuffs unfit for consumption); Auten v. Employers Nat. Ins. Co., 722 S.W.2d 468, 469 (Tex. App.1986) (finding that "[c]ontamination occurs when a condition of impairment or impurity results from mixture or contact with a foreign substance"); Richland Valley Prods., 548 N.W.2d at 130 (stating that contamination "connotes a condition of impurity resulting from mixture or contact with a foreign substance, and that it means to make inferior or impure by mixture; an impairment of impurity; loss of purity resulting from mixture or contact" (internal quotation and citation marks omitted)).
 
 
 42
 Other courts have eschewed the foregoing definitions, opting to define the term "contamination" contextually. In Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co., 132 F.3d 526 (9th Cir.1997), our sister Circuit addressed the insurers' contention that the "pollution exclusion" in a commercial general liability policy applied in that case so as to exclude coverage for losses sustained as a result of the addition of a foreign substance to crude oil transported in a pipeline. 132 F.3d at 528. In that case, the at-issue policy excluded coverage for loss resulting from "pollution or contamination." Id. at 529. Recognizing that an "insurance policy clause is ambiguous when different persons looking at the clause in light of its purpose cannot agree upon its meaning," id. at 530 (quotation marks omitted), the Ninth Circuit agreed with the district court in determining that "although `contamination' is not defined in the policy, it must be construed within the context of the pollution exclusion." Id. (emphasis supplied). The term "contamination," the court explained, "is an environmental term of art and applies only to discharges of pollutants into the environment." Id. The court also agreed with the district court's rejection of the insurers' common-sense approach to defining "contamination," as that approach would render an interpretation that was "virtually boundless" and would reach "far beyond the reasonable expectations of the insured." Id.
 
 
 43
 The Enron Oil court found that the insurers' expansive definition of "contamination" demonstrated the "ambiguity convincingly; under their interpretation, the [contamination] exclusion would be virtually limitless, extending to claims for product liability (for example, a bottle manufactured with impure glass) or for negligence (for example, spoilt food served in a restaurant) that arguably involved an impurity resulting from contact with a foreign substance." Id. The Ninth Circuit concluded that the use of the words "`seepage, pollution and contamination,' together with the specific exclusion of `the cost of removing, nullifying or cleaning-up seeping polluting or contaminating substances,' sends an unmistakable message to the reasonable reader that the exclusion deals with environmental-type harms." Id. The Ninth Circuit thus opted for a contextual definition of contamination, an approach with which we agree.
 
 
 44
 Similarly, in Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037 (7th Cir.1992), the Seventh Circuit examined an insurance policy's pollution exclusion clause, in which the definition of pollutant included "any . . . thermal irritant or contaminant." 976 F.2d at 1043. The court held that the "terms `irritant' and `contaminant,' when viewed in isolation, are virtually boundless, for `there is virtually no substance or chemical in existence that would not irritate or damage some person or property.'" Id. at 1043 (quoting Westchester Fire Ins. Co. v. City of Pittsburgh, 768 F.Supp. 1463, 1470 (D.Kan.1991)). Further analyzing the expansive definition of contaminant sought by the insurer in the pollution context, the Seventh Circuit explained: [W]ithout some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.
 
 
 45
 976 F.2d at 1043.
 
 
 46
 In McConnell Constr. Co. v. Ins. Co. of St. Louis, 428 S.W.2d 659 (Tex.1968), the Texas Supreme Court affirmed the judgment of the trial court (and reversed the judgment of the intermediate appellate court) in determining that the damage claimed was not the result of contamination. In McConnell, "muriatic acid was applied to the brick and mortar of a new floor" of a new house. Id. at 660. By virtue of that application, a chemical reaction occurred, resulting in fumes and gases arising from the floor. Those gases damaged the metal parts of the house — doorknobs, metal fixtures, aluminum window frames, and the like — by causing corrosion. Id. The Texas Supreme Court held:
 
 
 47
 Corrosion and contamination are not synonymous terms. The connotation of contamination is a mixing of substances like dirt and water which results in an impure mixture. Corrosion on the other hand connotes disintegration, oxidation, decay of metal and the like. While it may be possible that under certain situations, a corrosion may also be classified as a contamination, that is not the situation here. We have no mixing of substances resulting in impurity. We have a pitting, a destruction and a disintegration of metal caused by chemical fumes and a resultant degenerative reaction adversely affecting the structure of metal. We hold that the loss in this case was comprehended by the insuring clause of the policy and was not excluded therefrom.
 
 
 48
 Id. at 661 (emphasis supplied). McConnell amply illustrates how the term "contamination" may be used improperly as a synonym for various types of damage and chemical processes, which may or may not properly be classified as contamination or excluded from coverage under the terms of a policy.
 
 
 49
 We find that the term "contamination" is ambiguous in the context of the St. Paul Policy, because the common definition of the term that the District Court employed — the "introduction of a foreign substance that injures the usefulness of the object" or "a condition of impurity resulting from the mixture or contact with a foreign substance" — would allow the contamination exclusion in the Policy to be applied in a limitless variety of situations.
 
 
 50
 An illustration of a how the term "contamination" may have a virtually boundless set of applications in the all-risk policy context may be served by example. Consider the situation if the Twin Towers had collapsed directly on top of the Property, causing substantial damage. In such an instance, the Property surely would be insured for that loss under the all-risk commercial insurance Policy. However, St. Paul, taking the position that it does here, could argue that the damage to the building in this example resulted from the introduction of a foreign substance that injures the usefulness of the object, see Hi-G, Inc., 391 F.2d at 925, or "a condition of impurity resulting from the mixture or contact with a foreign substance," Myrick, 304 F.2d at 183, the definitions applied by the District Court in the case at bar.
 
 
 51
 Consider also the example of a fire, an insurable event or peril. The ash and soot from the fire could arguably be considered a foreign substance injuring the usefulness of a building or object. Certainly, soot and ash could also be considered an "impurity" in a building that has suffered a fire. Indeed, the insurer made precisely this argument in Cantrell v. Farm Bureau Town & Country Ins. Co. of Missouri, 876 S.W.2d 660 (Mo.Ct.App.1994). In Cantrell, the insured's home was damaged by a fire, which resulted in the release of toxic chemicals and fumes throughout the home. The home was rendered uninhabitable as a consequence. The all-risk fire insurance policy issued to the insured in that case excluded coverage for "contamination" but specifically covered losses from "fire" and "smoke." Id. at 662. The insurer denied coverage of the insured's claim under the policy's contamination exclusion, explaining that contamination, undefined in the policy, meant "to make inferior or impure by admixture." Id. at 664 (internal quotation marks omitted). The court found that the word "contamination" was "not unambiguous" and had a broad meaning that encompassed at least four types of damage.
 
 
 52
 The court identified the four types of contamination as (i) "[g]radual contamination" from natural sources or "unknown or various external sources," such as pollution, contamination from radon or other noxious natural sources, or exposure to raw sewage or chemicals used as pesticides or herbicides; (ii) contamination from "activities or events not occurring on the insured's property, such as nuclear radiation, or toxic gas resulting from an accident or mishap"; (iii) contamination resulting from an "uncovered event or activity occurring on the insured's property, such as the negligent or malicious saturation of a floor or wall with chemicals designed for use as pesticides or fertilizers"; (iv) contamination resulting from a "covered event occurring on the insured's premises," such as smoke damage to unburned parts of a house damaged by fire. See id. at 664 (emphases in original). The court explained, however, that smoke damage, identified by the court as a fourth type of contamination, would ordinarily not fall within the ambit of what the reasonable person would consider to be excluded damage under an insurance Policy's contamination exclusion:
 
 
 53
 Permeation of the house with toxic or noxious smoke and/or fumes would fit this very broad definition. However, there may be many conceivable types and sources of contamination....
 
 
 54
 Smoke damage, by the definition cited by Farm Bureau, would be contamination. The smoke has made the other parts or contents of the house "inferior or impure by admixture." If the word contamination were to be given the broad, all-encompassing definition advanced by Farm Bureau, smoke damage of any type would have to be excluded from Farm Bureau's type three coverage. The policy states: "We cover direct loss not otherwise excluded in this policy, that follows caused by fire, smoke (but not smoke from agricultural smudging or industrial operations)...." If contamination were intended to include any impurity caused by admixture, smoke damage could never be covered because of the "not otherwise excluded" language.
 
 
 55
 The exclusion section does not clearly exclude contamination resulting from a covered event. A reasonable person reading the exclusion would expect the first two types of contamination to be the types of contamination excluded. The other types of items listed in the exclusions section are of similar nature to the first and second types listed above. Whether the third type of contamination is covered is less certain, but an argument can be made that a reasonable person would also understand the third type of contamination would not be covered. The first three types of contamination involve contamination without occurrence of a covered event. However, a reasonable person would not determine that smoke damage caused by a covered fire, would be excluded from coverage.
 
 
 56
 Id. at 664-65 (footnotes omitted).
 
 
 57
 In the context of a liability insurance policy, at least one New York State court has also found the term "contamination" or "contaminant" to be ambiguous. In Pepsico, Inc., the insured used faulty raw ingredients in its soft drink products, which caused the products to have an unintended taste and which necessitated the destruction of the damaged products. 788 N.Y.S.2d at 143. The insurance carrier in that case disclaimed coverage, relying on the policy's contamination exclusion. The carrier claimed that contamination meant "to make inferior or impure by mixture." Id. at 144. The New York State Supreme Court, Appellate Division, however, determined that
 
 
 58
 [t]o accept [the insurance carrier's] interpretation would require that the term "contamination" be read literally, whereas New York courts, in construing terms in pollution exclusions, favor a common-sense approach over a literal approach. [The insurance carrier's] reading also ignores the general purpose of pollution exclusions, which is to exclude coverage for environmental pollution.
 
 
 59
 .... At best, there being more than one reasonable interpretation to the meaning of the term "contamination," the exclusion is ambiguous. Since it is ambiguous, the exclusion must be construed in favor of the insured. To accept [the insurer's] reading would also contradict the "common speech" and "reasonable expectations of a businessperson" who has come to understand standard pollution exclusions as exclusions addressing environmental-type harms.
 
 
 60
 Id. (internal citations omitted); cf. Nautilus Ins. Co. v. Jabar, 188 F.3d 27, 30 (1st Cir.1999) ("We also find ambiguity in the exclusion's definition of `pollutant.' The . . . policy defines `pollutant' as `any solid, liquid, gaseous, or thermal irritant or contaminant.' As other courts have observed, the terms `irritant' and `contaminant' are virtually boundless, for `there is no substance or chemical in existence that would not irritate or damage some person or property.'" (quoting Pipefitters, 976 F.2d at 1043)); Herald Square Loft Corp. v. Merrimack Mut. Fire Ins. Co., 344 F.Supp.2d 915, 919-20 (S.D.N.Y.2004) ("The language of the pollution exclusion clause of the 2002 policy is so broad that it cannot literally mean what it says. As defined, `pollutants' is so broad that ambiguity is created. Literally construed, the words would encompass the `release' or `dispersal' of ordinary household dust, for household dust is arguably a `solid . . . irritant or contaminant, including . . . waste'.... [T]he term `pollutant' is ambiguous because there is virtually no substance or chemical in existence that is not an `irritant or contaminant.'") (quoting Pipefitters, 976 F.2d at 1043; Roofers' Joint Training, Apprentice & Educ. Comm. of Western N.Y. v. Gen. Accident Ins. Co. of Am., 275 A.D.2d 90, 713 N.Y.S.2d 615 ((2000))).
 
 
 61
 Without doubt, there are many situations where an insured's property is rendered "impure" or is damaged by "the introduction of a foreign substance." Under an all-risk policy, almost any unintended damage to a building or its contents could be considered contamination within these broad definitions of the term. Under such a construction, the all-risk policy would insure against virtually nothing. Accordingly, we find that the term "contamination" is ambiguous in the context of the all-risk Policy that we are considering. The District Court concluded "[w]hether the airborne substance at issue is considered pulverized, abrasive, corrosive, erosive, particulate or contaminant, the effect on the Property was contamination." Parks Real Estate, 2005 WL 2414771, at *4. We are not so sure that the damage caused by the settling of the airborne matter into Parks' Building, machinery, and equipment was intended by the parties to constitute contamination excluded from the Policy's coverage. Because of the "virtually boundless" array of possible applications of the term contamination in the contamination exclusion provision, we think that the parties should be allowed to introduce evidence of what was intended by the use of this ambiguous term. See Morgan Stanley Group Inc., 225 F.3d at 275-76. Opting for the contextual approach, we think that questions of material fact pertaining to the meaning of the term contamination under this all-risk Policy remain for resolution by the trier of fact. Accordingly, a remand for that purpose is indicated in this case.
 
 IV. Efficient Causation
 
 62
 Parks claims that the District Court's "most critical error" was its determination that the particulate cloud resulting from the collapse of the World Trade Center was the "efficient cause" of alleged loss and therefore was not covered by the Policy. "In order to obtain coverage under a first-party [insurance] policy, the insured must suffer a loss caused by a covered peril (in a named perils policy) or suffer a loss not caused by an excluded peril (in an all risk policy). A covered peril and an excluded peril can combine to cause a covered loss." Ostrager & Newman, supra, § 21.02[c], at 1313 (citing Shelter Mut. Ins. Co. v. Maples, 309 F.3d 1068, 1070-71 (8th Cir.2002)). In a case where a covered and excluded peril combine to cause a covered loss, courts typically apply the efficient proximate cause rule — meaning, that the insured is entitled to coverage only if the covered peril is the "predominant cause of the loss or damage." Id.
 
 
 63
 "The efficient proximate cause of a loss is the cause that originally sets other events in motion." Kula v. State Farm Fire & Cas. Co., 212 A.D.2d 16, 628 N.Y.S.2d 988, 991 (N.Y.App.Div.1995). A court must not, however, examine or identify "the event that merely set[s] the stage for [a] later event." Kosich v. Metro. Prop. & Cas. Ins. Co., 214 A.D.2d 992, 626 N.Y.S.2d 618, 618 (N.Y.App.Div.1995) (internal quotation marks omitted). "Only the most direct and obvious [efficient] cause should be looked to for purposes of the exclusionary clause." Kula, 628 N.Y.S.2d at 991. "When the court interprets an insurance policy excluding from coverage any injuries `caused by' a certain class of conditions, the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." Kimmins Indus. Serv. Corp. v. Reliance Ins. Co., 19 F.3d 78, 81 (2d Cir.1994) (internal citations and selected quotation marks omitted).
 
 
 64
 Parks contends that the efficient cause of its loss was the collapse of the Twin Towers in the first instance, an event that the parties agree would be covered under the Policy. In rejecting Parks' argument, the District Court found that while the collapse of the World Trade Center was the efficient cause of the particulate cloud, it was not the efficient cause of the damage to the building: "the efficient cause of [Parks'] loss was not the collapse of the [World Trade Center] as [Parks] contend[s] but rather the contamination that affected the Property in the wake of the collapse." Parks Real Estate, 2005 WL 2414771, at *5. The court further determined that "contamination" occurred with "the actual contact between the Particulate and the Property — an occurrence that is excluded under the Policy's Contamination Exclusion." Id. at *6.
 
 
 65
 We agree with the District Court to the extent that it found that "the actual contact of the airborne particulate matter with the Property," id. at *5, was the efficient cause of damage to the insured Building. The cloud of particulate matter was capable of producing damage only upon contact with the insured Property. At best, contamination was not the cause of the damage that resulted from contact between the cloud of particulate matter and the Building, but the resulting damage itself. Whether that damage is "contamination," however, is a question yet to be resolved in this case. Said differently, while the cloud of particulate matter caused damage to the insured Property, coverage will depend upon whether that damage was "contamination" within the meaning of this Policy. Insofar as the damage constituted contamination, it is excluded from coverage. Insofar as the damage was not contamination, however, it is covered.
 
 CONCLUSION
 
 66
 The summary judgment granted by the District Court is vacated, and the case is remanded for proceedings consistent with the foregoing.
 
 
 
 Notes:
 
 
 *
 The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation