**OCEAN PARTNERS, LLC and Battery Commercial Associates, LLC, Plaintiffs,**

v.

**NORTH RIVER INSURANCE COMPANY, Defendant.**

**No. 04 CV 470(BSJ)(GWG).**

United States District Court, S.D. New York.

Feb. 28, 2008.

Lisa N. Wall, Olshin Et Al., New York, NY, Lisa N. Wall, Weg And Myers, P.C., New York, NY, for plaintiffs.

Andrew C. Jacobson, Kirk Marshall Zapp, Clausen Miller, P.C., New York, NY, Vincent J. Velardo, Beigelman & Associates, P.C., New York, NY, for defendant.

### *ORDER*

BARBARA S. JONES, District Judge.

Plaintiffs Ocean Partners, LLC and Battery Commercial Associates, LLC (collec-

tively, "Ocean Partners" or "Plaintiffs") have brought suit against Defendant North River Insurance Company ("North River" or "Defendant") to recover insurance proceeds for damages sustained to 17 Battery Place (the "Building"). North River had issued a first-party property insurance policy for the period January 26, 2001 to January 26, 2002 (the "Policy"). The Building, which is located in lower Manhattan near the World Trade Center ("WTC"), was "impacted" by materials generated from the collapse of the Twin Towers on September 11, 2001 ("WTC Particulate"), and, subsequently, Ocean Partners submitted a claim to North River for its property damage. North River determined that Ocean Partners suffered "some compensable loss," for which North River paid $3,104,849.48. After North River declined to make any further payments, Ocean Partners filed suit seeking additional payments under the Policy.

North River moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, alleging that coverage is not available because of two exclusions in the Policy. On January 14, 2008, Magistrate Judge Gabriel W. Gorenstein issued a Report and Recommendation ("R & R"), recommending that Defendant's motion be denied. Specifically, Judge Gorenstein found that, following the Second Circuit's decision in *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33 (2d Cir.2006), the meaning of the pollution exclusion contained in the Policy must be resolved by the trier of fact. Moreover, Judge Gorenstein rejected North River's argument that the collapse of the WTC was the "efficient" cause of the loss, and, therefore, the "collapse" exclusion did not apply. Finally, Judge Gorenstein declined to address

North River's argument, put forth for the first time in its reply brief, that the "corrosion" exclusion bars coverage.

Defendant filed timely objections to the R & R, specifically, the portions related to the pollution and corrosion exclusions. For the reasons that follow, the Court rejects Defendant's objections and adopts the R & R in whole; thus, the Defendant's motion for summary judgment is DENIED.

## DISCUSSION[1]

In its objections to the R & R, North River challenges the denial of the summary judgment motion on two grounds. First, North River argues that Judge Gorenstein did not directly address whether a question of material fact exists with respect to whether WTC Particulate is a "contaminant" in light of expert reports that were submitted in connection with the case. North River asserts that the evidence and admissions in this case already establish that the WTC Particulate is a contaminant under the "contextual approach" described in *Parks Real Estate*, and that summary judgment is appropriate. Second, North River objects to Judge Gorenstein's declining to consider the application of the corrosion exclusion in the Policy because it was first addressed by North River in reply papers.

### A. Standard of Review

Under Federal Rule of Civil Procedure 72(b), a District Court "shall make a de novo determination . . . of any portion of the magistrate judge's disposition to which specific written objection has been made." Fed.R.Civ.P. 72(b). The Court "may accept, reject, or modify the recommended decision." *Id.*

1. Additional background information has been laid out in the R & R. Defendant, in its Objections, does not dispute the background of the case as set forth in the R & R and only challenges the application of the law therein.

## B. The Pollution Exclusion

### 1. Determining the Scope of an Exclusion

Summary judgment is appropriate in a contract dispute "only if the language of the contract is wholly unambiguous." *Compagnie Financiere De Cic Et De L'UNION Europeenne v. Merrill Lynch,* 232 F.3d 153, 157–58 (2d Cir.2000) (citations omitted). Determining whether "the language of a contract is clear or ambiguous is a question of law to be decided by the court." *Id.* at 158. If a "reasonably intelligent person" could objectively find more than one meaning of the language in a contract, in light of the agreement as a whole, then the language is ambiguous. *See id.* (citations omitted). "[A]n ambiguity is not created simply because the parties to an insurance contract put forward different interpretations of its terms, particularly 'where one of two competing constructions is strained or unnatural.'" *Colson Services Corp. v. Ins. Co. of N. Am.,* 874 F.Supp. 65, 68 (S.D.N.Y.1994) (quoting *County of Schenectady v. Travelers Ins. Co.,* 48 A.D.2d 299, 368 N.Y.S.2d 894, 897 (3d Dep't 1975)). Instead, ambiguity exists where a reasonably intelligent person could find more than one meaning of a contract term in light of the agreement as a whole and the customs and practices of a particular trade. *See World Trade Ctr. Props.,* 345 F.3d at 184. When ambiguous language is found by the court, its meaning is generally to be resolved by the factfinder unless "the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide to the contrary" or if the nonmoving party fails to identify extrinsic evidence supporting its interpretation of the contract's language. *Id.*

Under New York law, an insurance contract is construed in the same manner as other contracts and must be read to give effect to the intent of the parties as expressed in the plain meaning of the words in the contract. *See id.* at 183–84 ("[W]ords should be given the meanings ordinarily ascribed to them and absurd results should be avoided.") (citing *Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 135 (2d Cir.1986)); *see also Ogden Corp. v. Travelers Indem. Co.,* 681 F.Supp. 169, 173 (S.D.N.Y.1988). With respect to the applicability of an exclusion, the insurer bears the burden of proving that a claim falls within the scope of an exclusion. *See, e.g., Village of Sylvan Beach, N.Y. v. Travelers Indem. Co.,* 55 F.3d 114, 115–16 (2d Cir.1995); *Maurice Goldman & Sons, Inc. v. Hanover Ins. Co.,* 80 N.Y.2d 986, 592 N.Y.S.2d 645, 607 N.E.2d 792, 793 (1992). "To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Sea Ins. Co. v. Westchester Fire Ins. Co.,* 51 F.3d 22, 26 (2d Cir.1995) (citation omitted).

### 2. The Policy

In a section labeled "Exclusions," the Policy provides:

2. We will not pay for loss or damage caused by or resulting from . . . :

\* \* \* \* \* \*

j. Discharge, dispersal [,] seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss."

Coverage Form at 15–16 of 32. The Policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot [,] fumes, acids, alkalis, chemicals and waste." *Id.* at 31 or 32.

According to an expert report submitted by Ocean Partners, the WTC Particulate that impacted the Building was made up of "more than 1.2 million tons of building materials ... primarily from insulation and from fireproofing" which included asbestos, lead and mercury. Lee Report at 2061. A cloud of WTC Particulate moved through the Building's pathways, including its HVAC, mechanical and electrical systems. *Id.* at 2060. Ocean Partners asserts that the WTC Particulate must be removed from the Building to protect human health and to address damage to the Building's systems.

### 3. *The R & R/Defendant's Objection*

■ North River argues that the damage at issue was "caused by or resulting from ... dispersal ... of 'pollutants' " insofar as the Policy's definition of "pollutant" includes the word "contaminant." In the R & R, Judge Gorenstein noted that the term "contamination" was also contained in the policy at issue in *Parks Real Estate,* another insurance coverage case involving infiltration of WTC Particulate in which the Second Circuit considered at length whether "contamination" was an ambiguous term. The court in *Parks Real Estate* found the term "contamination" was ambiguous in the context of the contract because the breadth of its common definition would function to exclude coverage in "a limitless variety of situations." 472 F.3d at 45. In light of the ambiguity in the term, the Second Circuit determined that the parties were permitted to introduce evidence of what they intended "contamination" to mean under the policy. *Id.* at 48.

Because of the strong similarities between the policy in *Parks Real Estate* and the Policy in the present case, Judge Gorenstein found that it is not clear that the term "contamination" in the present case was intended to exclude WTC Particulate, and that such a determination should be made by a trier of fact. North River does not appear to object to the finding that the term is ambiguous. However, Defendant does argues that, because there are more than 25 instances in Plaintiffs' expert reports where scientific and environmental experts refer to WTC Particulate as a "contaminant" or "contamination," Judge Gorenstein was incorrect in finding that a question of fact remains regarding the meaning of this term. In North River's view, the experts' use of these terms constitutes proof that the WTC Particulate is a "contaminant" and thereby an excluded pollutant.

North River's argument is not tenable, however. As Judge Gorenstein noted in the R & R, the experts' use of the words "contaminant" or "contamination" in their reports is "entirely consistent with the *Parks Real Estate* ruling." R & R at 16. The repeated use of these terms in the reports underscores the holding of the Second Circuit in *Parks Real Estate:* that the word "contaminant" has a commonly-used meaning, but that meaning is so "broad" that it is ambiguous in the context of the insurance policy that is being considered. *See* 472 F.3d at 47–48. As the court noted, "the term 'contamination' may be used improperly as a synonym for various types of damage and chemical processes, which may or may not properly be classified as contamination or excluded from coverage under the terms of a policy." *Id.* at 45. Thus, the Court cannot accept North River's view that the use of the term by the experts in their scientific and environmental reports is evidence of the parties' intent with respect to use of the term in the Policy.

Accordingly, the Court finds that the term "contaminant" as applied to the pollution exclusion in the Policy is ambiguous, and that its meaning remains for resolution by a factfinder and not the Court on summary judgment.

## C. *The Corrosion Exclusion*

■ North River also objects to Judge Gorenstein's declining to consider its argument that the "corrosion" exclusion contained in the Policy bars the claims in this case. Judge Gorenstein, in a footnote to the R & R, noted that North River's notice of motion and initial brief raised only the pollution and collapse exclusions as bars to coverage. Because the first discussion of whether the "corrosion" exclusion bars Plaintiff's claims is found in Defendant's reply papers, Judge Gorenstein declined to address the argument. R & R at 10 n. 8 (citing *Fisher v. Kanas*, 487 F.Supp.2d 270, 278 (E.D.N.Y.2007); *Estate of Ungar v. Palestinian Auth.*, 451 F.Supp.2d 607, 611 (S.D.N.Y.2006); *ABN AMRO VER-ZEKERINGEN BV v. Geologistics Ams., Inc.*, 485 F.3d 85, 97 n. 12 (2d Cir.2007)).

In its objections, North River attempts to distinguish the procedural history of this case from the facts of the cases cited in the R & R. North River argues that it "raised" the corrosion exclusion in its initial memorandum, although the Court notes that it did so only in a short footnote that states, in its entirety, that "[t]he policy also excludes 'corrosion' as a cause of loss." Def.'s Mem. of Law at 7 n. 4. Defendant also attempts to distinguish this case on the grounds that its discussion of the corrosion exclusion in the reply papers was the result of a "judicial admission" on the part of Plaintiffs in their response memorandum. However, in particular because it is the insurer's burden to establish an exclusion to a policy, the Court does not find it appropriate to deviate from the general rule set forth in the case law that it is improper practice to raise arguments

in the first instance in a reply brief. *See Patterson v. Balsamico*, 440 F.3d 104, 114 (2d Cir.2006). Accordingly, the Court adopts the recommendation of Judge Gorenstein that Defendant's argument regarding the corrosion exclusion not be considered on summary judgment.

### CONCLUSION

Having reviewed the objected-to portions of the R & R *de novo* in light of the parties' arguments, this Court adopts Judge Gorenstein's well-reasoned R & R in whole. Accordingly, Defendant's motion for summary judgment is DENIED. **SO ORDERED.**

### *REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

Plaintiffs Ocean Partners, LLC and Battery Commercial Associates, LLC (collectively, "Ocean Partners") have brought suit against their insurer, North River Insurance Company ("North River"), to recover insurance proceeds for damages sustained to their building during the September 11, 2001, attack on the World Trade Center ("WTC"). North River now seeks summary judgment alleging that the loss is not covered by its insurance policy based on two exclusions. For the reasons stated below, North River's motion for summary judgment should be denied.

## I. *BACKGROUND*

### A. *The Policy*

Ocean Partners owns 17 Battery Place ("the Building"), a commercial and residential building in lower Manhattan.[1] *See* Defendant's Statement of Material Facts,

---

1. Ocean Partners, LLC owns floors 14 to 31 and Battery Commercial Associates, LLC owns floors 1 through 13. *See* Amended Complaint, dated Feb. 25, 2005 (reproduced

as Ex. B to Declaration of Lisa Wall in Opposition to Defendant's Motion for Summary Judgment, filed May 17, 2006 (Docket # 51) ("Wall Decl.")), ¶¶ 1–2.

dated Apr. 17, 2006 (annexed to Defendant's Motion for Summary Judgment, filed April 17, 2006 (Docket # 48) ("Motion")) ("Def.56.1"), ¶ 1. In January 2001, North River issued a first-party property insurance policy (the "Policy") to Ocean Partners covering the period January 26, 2001 to January 26, 2002. *Id.; see* Policy (reproduced as Ex. E to Declaration of Kirk M. Zapp in Support of Defendant's Motion for Summary Judgment (attached to Motion) ("Zapp Decl.")) ("Policy"), at *2.[2] The Policy provides coverage for "direct physical loss of or damage to Covered Property ... caused by or resulting from any Covered Cause of Loss." Policy at *33. The policy states that "Covered Causes of Loss means RISK OF DIRECT PHYSICAL LOSS unless the loss is" excluded or limited by the Policy. *Id.* at *35 (capitalization in original).

In a section labeled "Exclusions," the Policy provides

2. We will not pay for loss or damage caused by or resulting from any of the following:

    \*        \*        \*        \*        \*        \*

    i. Collapse, except as provided in the Additional Coverage for Collapse. But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

    j. Discharge, dispersal[,] seepage, migration, release or escape of 'pollutants' unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss.'[3]

*Id.* at *47–48 (alterations added). The policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot[,] fumes, acids, alkalis, chemicals and waste." *Id.* at *63 (alteration added).

B. *The Damages Sustained on September 11, 2001*

The Building is located near the WTC. On September 11, 2001,

> [t]wo commercial airliners were hijacked, and each was flown into one of the two 110–story towers. The structural damage sustained by each tower from the impact, combined with the ensuing fires, resulted in the total collapse of each building. As the towers collapsed, massive debris clouds consisting of crushed and broken building components fell onto and blew into surrounding structures.

Executive Summary, World Trade Center Building Performance Study, undated (annexed as Ex. G to Wall Deck), at 1.[4] Ocean Partners has provided an expert report, which we accept as true for purposes of this motion, reflecting that "more than 1.2 million tons of building materials were pulverised during the WTC Event, primarily from insulation and from fireproofing." Assessment 17 Battery Place/1 West

---

2. Asterisked page numbers refer to the page numbers listed at the bottom of each page of North River's compilation of documents, not to the Policy's original page numbers.

3. The Policy defines "specified causes of loss" as "Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; failing [sic] objects; weight of snow, ice, or sleet; water damage; me-

chanical, electrical or pressure system breakdown." Policy at *63.

4. While defendants are contesting the arguments made by Ocean Partners as to the significance of the facts described in the above-quoted paragraph, the Court does not understand defendants to be contesting these facts themselves. In any event, as will be clear in the next section, the sequence of events prior to the collapse of the WTC towers is not determinative of the instant motion.

Street Property, dated Dec. 2004 (annexed as Ex. H to Wall Decl.) ("Lee Report"), at 2061. The materials generated from the collapse of the towers, referred to as "WTC Particulate," include asbestos, lead, and mercury. *Id.* The report goes on to state that,

WTC Particulate possesses a unique set of characteristics by which it can be identified and differentiated, to a reasonable degree of scientific certainty, from particulate in non-impacted buildings. The WTC Particulate contains chemical and morphological characteristics that are distinct from 'typical, everyday' dust found in non-impacted buildings.

*Id.*

The report reflects that "the Building was impacted by WTC Particulate and WTC Hazardous Substances" emanating from the WTC towers. Lee Report at 2060. A "pressure differential [was] caused by the onrush of the WTC Particulate cloud that was created by the collapse of the WTC Towers." *Id.* "The pressure differential ... forced large quantities of particulate laden air to move through pathways, including but not limited to HVAC [heating, ventilation and airconditioning] and mechanical and electrical systems. The WTC Particulate infiltrated the Building, including the HVAC systems (ductwork, air handlers, chillers) elevators (cables, cabs, and controls) and electrical systems." *Id.*

In addition to damaging mechanical systems, maintenance costs have increased and various components of the Building have been so extensively damaged that "[i]t is likely to be physically and economi-cally unfeasible to remediate building systems and components sufficiently to assure long-term reliability of the equipment." *Id.* at 2058. The expert concludes that the "WTC Particulate must be removed to eliminate the risk to human health." *Id.* at 2059. Other experts have offered additional evidence as to damage caused by dust generated from the WTC collapse, such as damage to elevator, fire safety and HVAC systems. *See* Letter from Melvin B. Singer to A.J. Contracting, dated March 13, 2002 (annexed as Ex. A to Supplemental Declaration of Kirk M. Zapp in Support of Defendant's Motion, filed Feb. 2, 2007 (Docket # 59) ("Suppl. Zapp Decl.")).

After Ocean Partners submitted a claim to North River for its property damage, North River determined that Ocean Partners suffered "some compensable loss," for which North River paid $3,104,849.48. *See* Defendant's Answer to Second Amended Complaint and Counterclaim (reproduced as Ex. D to Zapp Decl.), ¶¶ 11, 28. North River declined to make any further payments, however. *Id.* ¶ 29. In January 2004, Ocean Partners filed a suit in New York State Supreme Court seeking additional payments under the Policy. *See* Complaint (annexed as Ex. A to Zapp Decl.). On January 21, 2004, North River removed the suit to this Court. *See* Notice of Removal, filed Jan. 21, 2004 (Docket # 1).

### C. The Current Motion

In April 2006, following discovery, North River moved for summary judgment on the ground that Ocean Partner's claim is barred by two exclusions in the Policy.[5]

---

5. The initial papers on the motion were as follows: Motion; Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment (attached to Motion) ("D.Mem."); Def. 56.1; Zapp Decl.; Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed May 17, 2006 (Docket # 50) ("P.Mem."); Wall Decl.; Plaintiffs' Statement of Material Facts as to Which There Exists Genuine Issues to Be Tried, dated May 17, 2006 (attached to Wall Decl.); Response to Plaintiffs'

In December 2006, the Second Circuit issued an opinion in *Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.*, 472 F.3d 33 (2d Cir.2006), vacating a lower court decision on which defendant's moving papers had heavily relied. Accordingly, the Court issued an Order directing the parties to "address[ ] the effect (if any) of the Second Circuit's decision in the *Parks Real Estate* case on defendant's motion." Order, filed Jan. 8, 2007 (Docket # 56). In response, the parties submitted additional briefing on the motion.[6]

## II. APPLICABLE LEGAL STANDARDS

### A. The Law Governing Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact "may reasonably be resolved in favor of either party" and thus, should be left to the finder of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed," and the court must draw "all justifiable inferences" in favor of the nonmovant. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis omitted), and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Generally, where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106

Statement of Material Facts as to Which There Exists Genuine Issues to Be Tried, filed May 31, 2006 (Docket # 53); Defendant's Memorandum of Law in Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, filed May 31, 2006 (Docket # 54) ("D. Reply Mem.").

**6.** *See* Defendant's Supplemental Memorandum of Law in Support of Defendant's Motion for Summary Judgment, filed Feb. 2, 2007 (Docket # 57) ("D.Suppl.Mem."); Suppl. Zapp DecL; Defendant's Supplemental Statement of Material Facts, filed Feb. 2, 2007 (Docket # 58); Plaintiffs' Response to Defen-

dant's Supplemental Statement of Material Facts, filed Feb. 16, 2007 (Docket # 60); Declaration of Joshua L. Mallin in Opposition to Defendant's Motion for Summary Judgment, filed Feb. 16, 2007 (Docket # 61); Defendant's Supplemental Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment, filed Feb. 23, 2007 (Docket # 63); Supplemental Memorandum of Law of Plaintiffs Ocean Partners, LLC and Battery Commercial Associates, LLC in Opposition to Defendant North River Insurance Company's Motion for Summary Judgment, filed Apr. 16, 2007 (Docket # 64).

S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (alteration in original).

"The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir.2002). However, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." *La-Salle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) (citation and internal quotation marks omitted). Whether a contractual provision is ambiguous is a "threshold question of law to be determined by the court." *Parks Real Estate*, 472 F.3d at 42 (citing cases). If a court determines that a contractual provision is ambiguous, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Id.* 472 F.3d at 43 (citation and internal quotation marks omitted).

### B. *Law Governing Interpretation of Insurance Policies*

#### 1. *Determining the Scope of An Exclusion*

New York courts interpret insurance contracts "to give effect to the intent of the parties as expressed in the clear language of the contract." *Goldberger v. Paul Revere Life Ins. Co.*, 165 F.3d 180, 182 (2d Cir.1999).[7] Generally, the terms of insurance policies are read "in light of common speech and the reasonable expec-

tations of a businessperson." *Parks Real Estate*, 472 F.3d at 42 (citing *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 13 A.D.3d 599, 599–600, 788 N.Y.S.2d 142 (2d Dep't 2004); *Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y.*, 241 A.D.2d 66, 68–69, 671 N.Y.S.2d 66 (1st Dep't 1998)). However, with regard to exclusion provisions, courts are more exacting. Where an insured seeks to challenge an exclusion, the insurer must satisfy a "heavy burden" before coverage will be denied. *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 384, 763 N.Y.S.2d 790, 795 N.E.2d 15 (2003). The insurer " 'must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon.' " *Parks Real Estate*, 472 F.3d at 42 (quoting *Throgs Neck Bagels*, 241 A.D.2d at 71, 671 N.Y.S.2d 66) (alteration in original). The terms of an exclusion should be " 'accorded a strict and narrow construction' " and " 'are not to be extended by interpretation or implication.' " *Parks Real Estate*, 472 F.3d at 43 (quoting *Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 476 N.E.2d 272 (1984)).

#### 2. *Whether a Term is Ambiguous*

In New York, " '[a]n ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, prac-

---

**7.** While neither party explicitly discusses choice of law, defendants assert that New York insurance law is "controlling," *see* D. Reply Mem. at 1—a proposition plaintiffs did dispute in their later briefing. In these circumstances, the parties have implicitly consented to having New York law apply, and

this " 'implied consent … is sufficient to establish choice of law' " on the question. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir.2000) (quoting *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)).

tices, usages and terminology as generally understood in the particular trade or business.'" *Parks Real Estate*, 472 F.3d at 42 (quoting *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir.2000)) (internal quotation marks omitted). However, the "'[t]he fact ... that terms of a policy of insurance may be construed as ambiguous where applied to one set of facts does not make them ambiguous as to other facts which come directly within the purview of such terms.'" *Morgan Stanley Group*, 225 F.3d at 276 (quoting 2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* 3d § 21:14 (1997)); *see also Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.*, 47 F.3d 34, 37 (2d Cir.1995) ("An exclusionary clause ... can be ambiguous in one context and not another." (citing *Cont'l Cas. Co. v. Rapid–Am. Corp.*, 80 N.Y.2d 640, 652, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993))). Also, "[i]n assessing ambiguity, we consider the entire contract to 'safeguard against adopting an interpretation that would render any individual provision superfluous.'" *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993)).

"If the court concludes that an insurance policy is ambiguous, then the burden shifts to the insurer to prove that its interpretation is correct ...." *Parks Real Estate*, 472 F.3d at 43. Where "extrinsic evidence is available but inconclusive, the burden shifts [to the insurer] at the trial stage[,] .... [but] in the absence of extrinsic evidence, the burden shifts [to the insurer] at the summary judgment stage." *Id.* (quotation marks and citation omitted) (some alterations added). And "[i]f the extrinsic evidence does not yield a conclusive answer as to the parties' intent, a court may apply other rules of contract construction, including the rule of *contra proferentem*, which generally provides that where an insurer drafts a policy any ambiguity in [the] ... policy should be resolved in favor of the insured." *Id.* (citation and internal quotation marks omitted) (alteration in original).

## III. DISCUSSION

In its motion for summary judgment, defendant argues that two exclusions in the Policy, relating to "pollutants" and "collapse," bar coverage in this case. Motion ¶ 2; D. Mem. at 1. We discuss each in turn.[8]

### A. The Pollution Exclusion

North River argues that the damage at issue was—to use the language of the Policy—"damage caused by or resulting from ... dispersal ... of 'pollutants.'" Policy at *47–48. Under the Policy, "'pollutants' means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot[,] fumes, acids, alkalis, chemicals and waste." *Id.* at *63 (alteration added). Perhaps because it could not seriously contend that the cloud of WTC

---

**8.** North River's notice of motion and initial brief raised only the pollution and collapse exclusions as bars to coverage. *See* Motion ¶ 2 ("The Policy's 'pollution' and 'collapse' exclusions bar Plaintiffs' claims for damage."); *accord* D. Mem. at 1. In its reply brief, North River for the first time discussed the question of whether an exclusion for "corrosion" bars the claims in this case. D. Reply Mem. at 17–18. Because it was not timely raised, we decline to address this argument.

*See, e.g., Fisher v. Kanas*, 487 F.Supp.2d 270, 278 (E.D.N.Y.2007) (argument raised for the first time in reply brief was waived) (citing cases); *Estate of Ungar v. Palestinian Auth.*, 451 F.Supp.2d 607, 611 (S.D.N.Y.2006) ("as a general rule, courts will not consider arguments raised for the first time in a reply brief"); *cf. ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.*, 485 F.3d 85, 97 n. 12 (2d Cir.2007) (declining to consider argument raised for the first time in a reply brief).

particulate was a "pollutant" as that term is normally understood, North River homes in on the word "contaminant" in this definition. It points out that the Ocean Partners' own experts repeatedly use the word "contaminate" and "contaminant" to describe damage that was done to 17 Battery Place. D. Mem. at 5–7. It concludes, therefore, that the pollution exclusion bars Ocean Partners' claim. *Id.* at 10.

The issue here, of course, is not whether the damage done to the building could be described as involving "contaminants" but rather whether what occurred at the Building is within the pollution exclusion of the Policy. As it turns out, we do not write on a clean slate on this point. The term "contamination" was also contained in the policy at issue in the recently-decided *Parks Real Estate* case, in which Second Circuit dealt at length with the meaning of this term and whether it should be deemed ambiguous in the context of infiltration by WTC particulate. Notably, Ocean Partners has obtained a report from the same expert used by the plaintiffs in *Parks Real Estate*, and large portions of the reports produced in each case are identical. *Compare* 472 F.3d at 38–39, *with* Lee Report at 2058–59. Thus, the evidence as to damage to the insured buildings and the cause of that damage is identical in both cases.

In addition, the texts of the policies at issue in both cases are similar in important respects. The Policy here—as elided in the way defendants argue—excludes "damage caused by or resulting from . . . dispersal . . . of . . . contaminant[s]." Policy at *47–48, 63. In *Parks Real Estate,* the Policy excluded "damage caused by or made worse by any kind of contamination of . . . property." 472 F.3d at 37. Indeed, if anything the policy in *Parks Real Estate* broadened the reach of the word "contami-

nation" by referring to "any kind of" contamination. *Id.*

Noting the requirements of New York law that an insurer has the burden of showing that the exclusion is stated in "clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon," 472 F.3d at 42 (citation and internal quotation marks omitted), *Parks Real Estate* found that the term "contamination" was ambiguous. *Id.* at 45. This conclusion is in line with many other cases that have found ambiguity in "pollution" clauses when applied to non-environmental pollution. *See, e.g., Herald Square Loft Corp. v. Merrimack Mut. Fire Ins. Co.*, 344 F.Supp.2d 915, 921 (S.D.N.Y. 2004); *Belt Painting Corp.*, 100 N.Y.2d at 382, 763 N.Y.S.2d 790, 795 N.E.2d 15.

*Parks Real Estate* reached this conclusion by first contrasting two types of cases dealing with pollution or contamination exclusions: those that look purely at the definition of "contamination" or "contaminant" in isolation, and those cases that adopt a "contextual" approach. 472 F.3d at 44. The Court identified *Enron Oil Trading & Transp. Co v. Walbrook Ins. Co.*, 132 F.3d 526 (9th Cir.1997), as a case that adopted the "contextual definition" of contamination, *Parks Real Estate*, 472 F.3d at 44, and stated that it agreed with this approach. *Id.* In *Enron Oil*, the policy excluded coverage for damage caused by "pollution or contamination." 132 F.3d at 529–30. A separate clause that followed made clear that the policy did not cover the cost of "removing, nullifying or cleaning-up seeping polluting or contaminating substances." *Id.* at 530. While noting that applicable state law would have viewed the terms "pollution or contamination" as including the sort of damage involved in that case, the Ninth Circuit con-

cluded that the terms had to be construed in light of the separate clause. *Id.* It found that with the inclusion of this clause, the policy sent "an unmistakable message to the reasonable reader that the exclusion deals with environmental-type harms." *Id.* Accordingly, it found that the damage at issue was not excluded by the policy.

*Parks Real Estate* next examined *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037 (7th Cir.1992), in which the Seventh Circuit considered a policy that excluded coverage for damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants." *Id.* at 1043. This clause was followed, however, by a clause that limited the pollutants excluded to those "at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste." *Id.* The Court found that because the pollution in that case arose from the handling and storage of waste—specifically, the disposal of waste by a scrap metal processor—the pollution exclusion applied. *Id.* at 1043–44. *Parks Real Estate* cited favorably language in *Pipefitters* noting that " '[w]ithout some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results.' " *Parks Real Estate*, 472 F.3d at 45 (quoting *Pipefitters*, 976 F.2d at 1043). Giving two " 'simple examples' "—bodily injuries caused by Drano or chlorine in a pool—the court noted that " '[a]lthough Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.' " *Parks Real*

*Estate*, 472 F.3d at 45 (quoting *Pipefitters*, 976 F.2d at 1043).

The remaining case discussed by *Parks Real Estate*, *McConnell Constr. Co. v. Ins. Co. of St. Louis*, 428 S.W.2d 659 (Tex. 1968), involved a policy that excluded "[l]oss by contamination including such loss by any radioactive or fissionable materials." *Id.* at 659. *McConnell* found that damage resulting from the creation of fumes and gases that followed application of acid to a brick floor did not constitute "contamination." *Parks Real Estate*, 472 F.3d at 45. *Parks Real Estate* discussed *McConnell* to illustrate "how the term 'contamination' may be used improperly as a synonym for various types of damage and chemical processes, which may or not properly be classified as contamination or excluded from coverage under the terms of a policy." *Parks Real Estate*, 472 F.3d at 45.

The *Parks Real Estate* case itself did not involve a policy such as the ones in *Enron Oil* and *Pipefitters*—that is, policies where the pollution or contamination exclusion was followed by a clause that provided some context to what was meant by the exclusion. Rather, the *Parks Real Estate* pollution exclusion—more in line with the *McConnell* case—read simply that the policy excluded "damage caused by or made worse by any kind of contamination of . . . property." 472 F.3d at 37. Similarly, the "pollution" exclusion in the instant case excludes coverage for dispersal of "pollutants" without any clauses giving context to the sort of pollution intended.[9] All that is provided is a definition of "pollutants" that contains the term "contaminant[ ]"—specifically: "any solid, liquid, gaseous, or thermal irritant or con-

---

**9.** The only limitation is the statement that the pollution exclusion will not apply if the "the discharge, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss,' " Policy at *48, such as fire,

lightning, explosions and a number of other causes. *Id.* at *63. This clause, however, does not shed further light as to the meaning of the word "pollutant."

taminant, including smoke, vapor, soot[,] fumes, acids, alkalis, chemicals and waste." Policy at *63 (alterations added).

In *Parks Real Estate*, the Court found that the term "contamination" was ambiguous in the context of the policy at issue in that case. 472 F.3d at 45. The reason it founds such ambiguity was that

> the common definition of the term that the District Court employed—the "introduction of a foreign substance that injures the usefulness of the object" or "a condition of impurity resulting from the mixture or contact with a foreign substance"—would allow the contamination exclusion in the Policy to be applied in a limitless variety of situations.

*Id. Parks Real Estate* gives the example of the WTC collapsing directly on top of the subject property. *Id.* It could not be the case, it noted, that the policy was intended to exclude the ensuing damage on the ground that the damage resulted from "the introduction of a foreign substance," or "a condition resulting from the mixture or contact with a foreign substance." *Id.* (citation and internal quotation marks omitted). The Court also cited favorably New York case law suggesting that a pollution exclusion should not be read literally but rather by keeping in mind "the general purpose of pollution exclusions, which is to exclude coverage for environmental pollution." *Id.* at 47 (citing *Pepsico*, 13 A.D.3d at 600, 788 N.Y.S.2d 142). Another case cited, *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27 (1st Cir.1999), contained a definition of "pollutant" substantively identical to the one at issue in the Policy here: "any solid, liquid, gaseous, or thermal irritant and contaminant." *Id.* at 30. *Nautilus* found this exclusion to be ambiguous.

*Parks Real Estate* concluded its discussion of the contamination exclusion as follows:

> Without doubt, there are many situations where an insured's property is ren-

dered "impure" or is damaged by "the introduction of a foreign substance." Under an all-risk policy, almost any unintended damage to a building or its contents could be considered contamination within these broad definitions of the term. Under such a construction, the all-risk policy would insure against virtually nothing. Accordingly, we find that the term "contamination" is ambiguous in the context of the all-risk Policy that we are considering. The District Court concluded "[w]hether the airborne substance at issue is considered pulverized, abrasive, corrosive, erosive, particulate or contaminant, the effect on the Property was contamination." *Parks Real Estate*, 2005 WL 2414771, at *4. We are not so sure that the damage caused by the settling of the airborne matter into Parks' Building, machinery, and equipment was intended by the parties to constitute contamination excluded from the Policy's coverage. Because of the "virtually boundless" array of possible applications of the term contamination in the contamination exclusion provision, we think that the parties should be allowed to introduce evidence of what was intended by the use of this ambiguous term. *See Morgan Stanley Group Inc.*, 225 F.3d at 275–76. Opting for the contextual approach, we think that questions of material fact pertaining to the meaning of the term contamination under this all-risk Policy remain for resolution by the trier of fact

472 F.3d at 48.

There is no basis on which to distinguish the exclusion in *Parks Real Estate* from the exclusion here. Just as was true in *Parks Real Estate*, there are many situations that fit the dictionary definition of "contamination" (or "contaminant") cited in that case. Because of the boundless array of possible applications of these terms, it is not clear that the Policy was

intended to exclude them. Thus, North River has not met its burden of showing that the pollutant exclusion "is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applied in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon." *Parks Real Estate,* 472 F.3d at 42 (citation and internal quotation marks omitted). Accordingly, the resolution of the exclusion's meaning must be made by the trier of fact.

The argument on which North River most heavily relies to distinguish *Parks Real Estate* is the fact that Ocean Partners experts state repeatedly that the Building is rife with "contamination" and "contaminants." D. Suppl. Mem. at 5–11; *see also* D. Mem. at 6–8. North River thus argues that in *Parks Real Estate* there was "minimal evidence of contamination," D. Suppl. Mem. at 6, whereas here Ocean Partners and its experts "overwhelmingly admit" that "WTC Particulate is a contaminant." D. Suppl. Mem. at 6. The use of these words by plaintiffs or their experts, however, is entirely consistent with the *Parks Real Estate* ruling. The problem with the word "contaminant" is not that it has no commonly-used meaning, but that in the context of the Policy its meaning is so "broad," *Parks Real Estate,* 472 F.3d at 48, as to be ambiguous. Notably, as North River has pointed out, *see* D. Mem. at 2, the expert report in *Parks Real Estate* is virtually identical to the main report proffered by plaintiffs here, and thus the repeated use of the terms "contaminants" and "contamination" was assuredly present in the *Parks Real Estate* case itself. *See* 472 F.3d at 39 (quoting expert report's reference to "contaminated moving parts").

### B. *Collapse Exclusion*

■ The applicability of the collapse exclusion turns on whether the damage to the Building was "caused by" collapse within the meaning of the policy. Policy at *48. *Parks Real Estate* addressed the law that governs the question of causation in an insurance policy exclusion as follows:

"The efficient proximate cause of a loss is the cause that originally sets other events in motion." *Kula v. State Farm Fire & Cas. Co.,* 212 A.D.2d 16, 628 N.Y.S.2d 988, 991 (N.Y.App.Div.1995). A court must not, however, examine or identify "the event that merely set[s] the stage for [a] later event." *Kosich v. Metro. Prop. & Cas. Ins. Co.,* 214 A.D.2d 992, 626 N.Y.S.2d 618, 618 (N.Y.App.Div. 1995) (internal quotation marks omitted). "Only the most direct and obvious [efficient] cause should be looked to for purposes of the exclusionary clause." *Kula,* 628 N.Y.S.2d at 991. "When the court interprets an insurance policy excluding from coverage any injuries 'caused by' a certain class of conditions, the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.,* 19 F.3d 78, 81 (2d Cir.1994) (internal citations and selected quotation marks omitted).

472 F.3d at 48.

In the brief submitted to this Court before the Second Circuit's decision in *Parks Real Estate,* North River noted that the district court in *Parks Real Estate* had found that the "contaminants" were the "efficient" cause of the loss and that the collapse of the WTC was the cause not of the loss, but of the contamination. D. Mem. at 9. North River further contended that the *Parks Real Estate* district court was "clearly correct" as to both these points. *Id.* But if the district court was correct that "collapse" was not the efficient cause of the loss—in other words, that

contamination was—the collapse exclusion does not apply.

Indeed, in its Rule 56.1 statement, North River asserts without qualification that "[t]he 'direct and most obvious' cause of the loss at issue in this litigation is 'contaminants' "—not collapse. Def 56.1 ¶ 35.

In its initial briefing Ocean Partners tried to locate the cause of damage in events occurring before the collapse, such as the airplane crashes, the explosions and the ensuing fire. *See* P. Mem. at 17. While *Parks Real Estate* presumably should be read as rejecting this argument, it made clear at the same time that the collapse was not the cause of the loss to the property either. Noting that the district court had found that the collapse was the efficient cause of the particulate cloud—and was thus not the efficient cause of the damage to the building—the Second Circuit agreed that the "efficient cause" of the damage to the insured building was "the actual contact of the airborne particulate matter with the Property." *Parks Real Estate*, 472 F.3d at 49. In other words, *Parks Real Estate* determined that "the cloud of particulate matter" was the efficient cause of the damage to the property. *Id.* Indeed, defendant concedes—as it must—that the Second Circuit "effectively reject[ed] the causation of loss arguments pinned on collapse." D. Suppl. Mem. at 4.

Applying this ruling to the instant case, the Court must reject the defendant's argument that the collapse of the WTC was the "efficient cause" of the loss. Accordingly, defendant is not entitled to a ruling that the collapse exclusion bars coverage.[10]

*Conclusion*

For the foregoing reasons, North River's motion for summary judgment should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Barbara S. Jones at 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Jones. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn*, 474 U.S. 140, 144–45, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Jan. 14, 2008.

---

10. Defendant also argues that it is entitled to summary judgment because Ocean Partners' counter-statement in response to their statement pursuant to Local Civil Rule 56.1 is deficient for failing to respond by numbered paragraphs corresponding to defendant's statement. D. Suppl. Mem. at 11. The defendant's statement, however, merely quotes the Policy, the complaint, and plaintiffs' expert reports, and concludes with two legal contentions that should not form part of a Rule 56.1 statement. Because there is no dispute as to the accuracy of these quotations and because the inclusion of the legal contentions was improper, plaintiffs' failure is of no significance. In any event, the Court would exercise its discretion not to penalize Ocean Partners for this failure. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").